In re Ida Louisa Pierce. (Habeas Corpus.)

In re IDA LOUISA PIERCE. (Habeas Corpus.)

JURISDICTION: HABEAS CORPUS: CONTEMPTS. *(1) Original jurisdiction of supreme court. (1, 7, 8) Writ of habeas corpus. (2–7) Jurisdiction of circuit court in cases of contempt. Distinction between punishment of criminal contempts and the civil remedy by indemnity. Statute of contempts construed.*

1. Where a petition to this court for a writ of *habeas corpus* shows an illegal imprisonment, the writ will not be denied except for the most weighty considerations, the existence of which must be determined in each case upon its own facts; and in this case, the petition of a private person showing an illegal imprisonment by order of a circuit court, as for contempt, this court grants the writ as an exercise of its *original* jurisdiction.

2. Sec. 23, ch. 149, R. S. 1858, relating to proceedings as for contempt (which declares that " when the misconduct complained of consists in the omission to perform some act or duty which is yet in the power of the defend-

ant to perform, he shall be imprisoned only until he shall have performed such act or duty," etc.), applies only to cases arising under sec. 21 of the same chapter, which provides a *civil remedy* by *indemnity* to the injured party; and not to cases of punishment as for a *criminal* contempt, under other provisions of said chapter.

3. In the punishment of criminal contempts as such, under our statutes, the utmost term of imprisonment in any case is six months, and until the costs and expenses are paid.  R. S. 1858, ch. 149, sec. 25.

4. The court cannot, in the same order or proceeding, award indemnity for the misconduct, under sec. 21, and punish it as a criminal contempt.  [Whether such indemnity may be awarded, and punishment inflicted, for the same act, *by distinct proceedings*, not considered.]

5. The "loss or injury" for which indemnity may be required under sec. 21, is a *pecuniary* loss, or an injury for which *damages* might be recovered in an action therefor.

6. Where judgment of divorce awards custody of a child of the parties to the father, and thereafter the mother abducts the child, and removes it from the jurisdiction of the court, the father cannot recover damages for such abduction and detention; and hence, the mother cannot be committed therefor as for a continuing contempt, under sec. 23, but the misconduct can only be punished criminally.

7. The court, in such a case, ordered the mother to restore the child to the custody of the father, and pay forthwith a fine of one dollar, and to stand committed to the county jail until she should fully comply with the order.  *Held*, that the order was in excess of the jurisdiction of the court, and the warrant of commitment "issued in a case not allowed by law;" and the remedy by *habeas corpus* is applicable.    R. S. 1858, ch. 158, sec. 19.

[RYAN, C. J., dissents, holding, 1. That the petition seeks relief against a mere *private* wrong, and this court should not take original jurisdiction to grant such relief, by any of the writs enumerated in sec. 3, art. VII of the constitution.   2. That the proceedings in the circuit court in which the commitment was made, could not properly be reviewed on *habeas corpus*, by any court or officer in the exercise of *original* jurisdiction; the circuit court having had jurisdiction of the person and of the subject matter, and its order being, at most, merely *erroneous*.]

8. Whether, in such case, this court could grant the writ as an exercise of its "general superintending control over all inferior courts," not determined.

APPLICATION for a *Habeas Corpus*.

*Ida Louisa Pierce* presented her petition to this court for

In re Ida Louisa Pierce.    (Habeas Corpus.)

a writ of *habeas corpus*, in which she alleged that she was un-lawfully restrained of her liberty, and imprisoned in the com-mon jail of the county of La Crosse, by Charles L. Halstead, sheriff of said county, for a supposed contempt in disobeying a decree of the circuit court for that county, made in an action for a divorce, in which Fred. P. Alter was plaintiff, and the pe-titioner, by the name of *Ida Louisa Alter*, was defendant. She prayed in her petition that a writ of *habeas corpus* might issue commanding said sheriff to bring her before the court, to be dealt with according to law.  The writ was allowed and issued, and in due time the sheriff produced the petitioner in court, and made due return to the writ, setting forth the authority under which he detained the petitioner in custody.

The following facts appeared from the return of the sheriff: In 1873, Fred. P. Alter obtained a judgment of divorce from his wife, the petitioner, in the circuit court for La Crosse county, in an action brought by him for that purpose.  The judgment contains a provision giving to him the exclusive care and custody of the infant child of the parties, Lottie Alice Al-ter, then aged about three years, which child was the only issue of the marriage.  In 1875, the petitioner made applica-tion to the court for an order giving her the exclusive care and custody of the child.  The court denied the application.

In April, 1878, Fred. P. Alter filed his affidavit in the cir-cuit court, wherein he stated that, on the 13th day of March preceding, the petitioner kidnapped and abducted the child, took her to Chicago, and had her concealed in or about that city, and refused to surrender her to him; and he prayed that the petitioner might be attached and brought before the court to answer for her misconduct, and to show cause why she should not return the child to him.

The court awarded the attachment and order to show cause as prayed, and the petitioner was attached and brought before the court to answer for her alleged misconduct.  Interrogator-ies were exhibited to her concerning the same, to which she

made answer in writing under oath. The court thereupon made an order requiring the petitioner to restore the child to the custody of Fred. P. Alter forthwith, to pay a fine of one dollar, and to stand committed to the common jail of La Crosse county until she should fully comply with such order. It is stated in the order, by way of recital, that the petitioner "is guilty of the contempt charged against her, and that such misconduct was calculated to, and did actually defeat, impair, impede and prejudice the rights of the above named plaintiff, and that the said *Ida Louisa Alter* has, in defiance of the order of this court, deprived the said plaintiff, Fred. P. Alter, of the care and custody of their infant child, Lottie Alice Alter."

A warrant of commitment, in all respects in accordance with the order, was thereupon issued to the sheriff, by virtue of which he held the petitioner in custody.

A copy of the affidavit of Fred. P. Alter (to which were appended copies of the divorce judgment, and the order of 1875), also copies of the order for an attachment, of the interrogatories to the petitioner and her answers thereto, of the order pursuant to which the commitment issued, and of the warrant of commitment, were annexed to the return of the sheriff, and constituted parts of it. Each of these papers, except the commitment, was entitled in the cause of *Fred. P. Alter v. Ida Louisa Alter*.

The petititioner demurred to the return of the sheriff.

The question whether this was a proper case for the exercise of the original jurisdiction of this court, was argued by counsel with the argument of the demurrer.

For the petitioner, a brief was filed by *John A. Daniels*, of counsel, and there was oral argument by *Hugh Cameron*. They contended that the circuit court had no jurisdiction or legal authority to make the commitment. 1. The power of the court in divorce cases to enforce its judgment respecting the care, custody and maintenance of the minor children is con-

ferred solely by sec. 15, ch. 111, R. S. 1858. *Barker v. Day-ton*, 28 Wis., 367; *Bacon v. Bacon*, 43 id., 197. The power there given the court " to enforce its judgments as in other cases," must be limited to proceedings in the divorce suit it-self, and does not extend to *independent* proceedings to enforce the judgment. The proceeding for contempt here is in the nature of a criminal prosecution; and is not a proceeding in the divorce suit, but one in which the state should be the party plaintiff. *Haight v. Lucia*, 36 Wis., 360. 2. The judgment in the divorce suit is, " that plaintiff have the sole and exclu-sive care and custody of the minor child, provided, however, that the defendant may at all suitable times visit said child at its home or such other place as the plaintiff may designate, subject, however, to the further order of the court in the prem-ises." Here is no provision requiring defendant to do or not to do anything. The decree is neither prohibitory nor actively mandatory; it does not enjoin defendant from removing the child from plaintiff's custody, nor require her to deliver it in-to his custody. It simply confirms his common-law right to such custody, and extends to the mother the favor of visiting the child at suitable times. It is not by its terms executory. In respect to the divorce itself, it was executed the moment it was signed; and in respect to the child, it is evidently based upon the theory that that was already in the father's custody; and the fact appears in the record here that plaintiff had the actual care and custody of the child, under the decree, for many years. The judgment, therefore, was *fully executed*. Sec. 1, ch. 149, R. S. 1858, confers jurisdiction to punish as for a con-tempt only where the misconduct complained of may defeat, impair, impede or prejudice the rights of a party in a cause or matter *depending in such court or triable therein.* 3. Im-plied injunctional orders are not a sufficient basis for proceed-ings as for a contempt; but the order alleged to be disobeyed must be positive and definite. 3. Abb. Pr., 211; *Campbell v. Campbell*, 37 Wis., 221. 4. This proceeding is evidently for

a criminal contempt, under ch. 149.   The commitment, however, does not show any *finding* that the rights or remedies of a party were liable to be defeated, impaired, impeded or prejudiced by defendant's misconduct *in any matter or proceeding depending in the court;* and such a finding is an essential prerequisite to the jurisdiction.   Moreover, there is no time expressed limiting the duration of the imprisonment; though sec. 25 of the statute declares that such imprisonment shall be "not exceeding six months and until the expenses of the proceedings are paid, and also, if a fine be imposed, until such fine be paid," and also requires that the duration of such imprisonment should be expressed in the commitment.   Again, the court does not adjudicate that the commission of the acts charged *constitutes a contempt.*   5.  The only provision which could in any case sustain a commitment like that in question, is that found in sec. 23 of the statute.   But this proceeding was not under that section.   The judgment in the divorce suit did not require defendant to perform any act or duty; and the court *did not find* in this proceeding that she had omitted to perform any act or duty required of her by that judgment. There is no jurisdiction to commit under sec. 23, until the court has judicially determined that defendant has been guilty of misconduct which consists in omitting to perform some act or duty which the judgment required her to perform, and also, that it is yet in her power to perform such act.   6.  The power of courts to punish for contempt is an exception to the constitutional provisions in favor of personal liberty, and cannot be extended beyond the limits imposed by statute.   *Rutherford v. Holmes*, 5 Hun, 317.   Judgments and orders made without authority are regarded as nullities.   *Elliott v. Peirsol*, 1 Pet., 340; *In re Tarble*, 25 Wis., 390; *In re Remington*, 7 id., 643.

For the respondent, a brief was filed by *Cameron, Losey & Bunn*, and there was oral argument by *Mr. Bunn.*   They contended, 1. That this court had no jurisdiction of the writ,

In re Ida Louisa Pierce. (Habeas Corpus.)

no interest or prerogative of the state being involved. *Att'y Gen. v. Railroad Cos.*, 35 Wis., 511; *Att'y Gen. v. Eau Claire*, 37 id., 442; *State ex rel. Wood v. Baker*, 38 id., 71; *State ex rel. Cash v. Juneau Co.*, id., 554; *State ex rel. The Board of Education v. Haben*, 22 id., 101, 110. See also Tay. Stats., 1792–3, §§ 3, 4. 2. That the circuit court had jurisdiction of the divorce suit, of defendant's person, and of the proceeding for contempt; and, if the order for commitment was not properly made, that was mere error, and this writ cannot be made to perform the functions of a writ of error or appeal. *Petition of Semler*, 41 Wis., 517; *In re Crandall*, 34 id., 177; *In re Perry*, 30 id., 268; *Hauser v. The State*, 33 id., 678; *In re O'Connor*, 6 id., 288; *In re Blair*, 4 id., 522; *People v. Cassels*, 5 Hill, 164. 3. That there was not even any error. (1) The matter of the divorce suit was still pending in the circuit court. Such a suit is always in the divorce court in respect to the care of minor children, until the children become of age, and in respect to alimony, until it ceases to be allowable. Tay. Stats., 1273, §§ 19, 20; 2 Bish. on M. & D., §§ 530 et seq.; *Cook v. Cook*, 1 Barb. Ch., 644; *Campbell v. Campbell*, 37 Wis., 211. (2) In cases of divorce under our statute, the father's common-law right as guardian of his minor child ceases; and the right of either parent to the care and custody of the child depends thenceforth entirely upon the adjudication of the court. 2 Bish. on M. & D., § 530; *Ahrenfeldt v. Ahrenfeldt*, 1 Hoff., 497; *Spratt v. Spratt*, 1 Swab. & T., 215; *Campbell v. Campbell, supra.* (3) The decree as to the custody of the child was in the usual form (*Barrere v. Barrere*, 4 Johns. Ch., 188; 5 Wait's Pr., 725; 2 Abb. Forms, 583; 3 Daniell's Ch. Pr., 2293), and no formal injunction was necessary. The father having been awarded the " sole and exclusive " custody of the child, any attempt by defendant to deprive him of such custody is a violation of the decree, and a contempt. 2 Story's Eq. Jur., § 1353, and cases cited; *State v. Farrar*, 41 N. H., 53;

*Comm. v. Nickerson*, 5 Allen, 518.    (4) The commitment did not exceed the authority of the court.    Tay. Stats., 1742, §§ 21–25, especially §§ 23, 24.    The circuit court has found, on a hearing, that it is possible for defendant to give up the child; and that finding is conclusive until reviewed by the appellate court.    It is no objection that such finding is not recited in the order, as it is not necessary nor good practice to embody in a mere order a finding of the facts on which it is based. The order complies with the requirement of the statute, and that is sufficient.    *In re Nugent*, 4 Penn. L. J. R., 130.    (5) The proceeding being for the enforcement of a civil remedy, the affidavit and order are properly entitled in the cause.    4 Wait's Pr., 175; *Stafford v. Brown*, 4 Paige, 360; *Pitt v. Davison*, 37 N. Y., 235.

LYON, J.    I. Within the rules of *Attorney General v. The Railroad Companies*, 35 Wis., 425; *Attorney General v. Eau Claire*, 37 id., 400; *State ex rel. Wood v. Baker*, 38 id., 71; and *In re Semler*, 41 id., 517, we think this is a proper case for the exercise of the original jurisdiction of this court.    The interest of the state in the personal liberty of its citizens is primary and proximate, and to secure such liberty to each citizen entitled thereto is one of the most important purposes of government.    "All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness.    To secure these rights, governments are instituted among men."    Const., art. I, sec. 1. It was said by this court in Semler's case, that "no rule should be adopted restricting the jurisdiction of this court over the writ of *habeas corpus*, which has ever been regarded as the best safeguard of personal liberty, except for the most weighty considerations.    The plenary power of this court over the writ has frequently been asserted and exercised under the constitution, and has hitherto not been questioned."    (p. 522.)

In *Attorney General v. Eau Claire* this court took original

jurisdiction of an information for a writ of injunction brought to restrain the city of Eau Claire from obstructing the navigation of the Chippewa river. The ground of the jurisdiction is thus stated by the chief justice: "Public rivers are highways by no local authority, and are rarely, if ever, within a single municipality or in charge of its officers. They are in the charge of the state, and the state cannot abdicate its charge of them. That charge is a duty to the federal government, and a trust for the whole people, not of the state only, but of the several states. An unauthorized encroachment upon any of them is a violation of the duty assumed by the state, in its aggregate and sovereign character, to keep them forever open. Every such encroachment is a *pourpresture*, which concerns the sovereign prerogative of the state, and the prerogative jurisdiction of this court. Original jurisdiction of such cases here is too manifest for discussion." (p. 447.)

In *State ex rel. Wood v. Baker* we issued a writ of *quo warranto*, to inquire into the right of the relator to a county office, alleged to have been usurped by the defendant, because of the necessity of a speedy determination of the right, and because the judge of the circuit court for the county was so situated in respect to the question that he was disqualified, in propriety if not in law, from sitting judicially in the case, and because we believed he would, for that reason, refuse to act in it.

The essential grounds, or many of them, upon which these judgments went, are present in this proceeding, and would be (although, perhaps, as to some of them in a qualified degree), if the case were considered with reference to the power of a court commissioner, as well as the circuit court, to issue the writ. We regard the above cases as ample authority for the exercise of our original jurisdiction here. And we take this occasion to reaffirm the doctrine of the Semler case, that this court should never deny the writ of *habeas corpus*, " except for the most weighty considerations," if the petition for the

writ shows an illegal imprisonment.   Whether such consider-
ations exist, must be determined in each case upon its own
facts.

These views render it unnecessary to consider whether the
jurisdiction may not also be rested upon the general superin-
tending control over all inferior courts, conferred upon this
court by sec. 3, art. VII of the constitution.

II.   We now proceed to consider this application on the
merits.   The imprisonment alleged is by virtue of an order of
the circuit court adjudging the petitioner in contempt for dis-
obedience to the order of that court contained in the divorce
judgment, awarding to the plaintiff in the divorce suit the
care and custody of the child Lottie Alice Alter.   In sub-
stance and form, the contempt proceedings were instituted
and are prosecuted under ch. 149, R. S. 1858, entitled "Of pro-
ceedings as for contempts, to enforce civil remedies, and to
protect the rights of parties in civil actions."   Unless they
can be upheld by the provisions of that chapter, they are
invalid.

The authority to commit the petitioner until she restore the
child to the care and custody of her former husband, to whom
such care and custody was awarded by the terms of the divorce
judgment, must be found, if at all, in sec. 23 of ch. 149, which
is as follows:   "When the misconduct complained of consists
in the omission to perform some act or duty which is yet in
the power of the defendant to perform, he shall be imprisoned
only until he shall have performed such act or duty, and paid
such fine as shall be imposed, and the costs and expenses of the
proceedings."   We must, therefore, ascertain the true mean-
ing and effect of this section, in order to determine whether it
has any application to a case like this.   To do so intelligently,
an examination of the various statutes for the punishment of
civil and criminal contempts is necessary.

Chapter 149 does not provide for the punishment of all
contempts, but only of those specifically enumerated in sec. 1,

by which the rights or remedies of a party in a cause pending in the court inflicting the punishment, or triable therein, may be defeated, impaired, impeded or prejudiced.   If the court regularly adjudge that these conditions exist in a given case, it may fine or imprison the offender, or both fine and imprison him in its discretion.   (Sec. 20).   But the fine is limited to $250 over and above the costs and expenses of the proceedings (sec. 22), and the imprisonment to six months, and until the costs and expenses are paid.   (Sec. 25.)   Punishment for those criminal contempts which do not necessarily defeat, impair, impede, or prejudice, the rights or remedies of a party in a cause or matter depending in the court, or triable therein, is prescribed in ch. 119, sec. 7.   The classification of criminal contempts in that section also includes many acts which are within the provisions of ch. 149.   When the contempt proceedings are under ch. 119, the fine cannot exceed $250, nor the imprisonment thirty days.   Sec. 11 of ch. 119 provides, that "nothing contained in the preceding sections shall be construed to extend to proceedings against parties or officers for any contempt, for the purpose of enforcing any civil right or remedy."

If, in a proceeding under ch. 149, the court shall adjudge the accused guilty of the misconduct specified in sec. 1, and shall fine or imprison him, or both, pursuant to sec. 20, the conviction and punishment are essentially as for a criminal contempt, and the fine goes to the school fund.   It was so held in *In re Murphey*, 39 Wis., 286.   The difference between the two chapters, in respect to criminal punishment for contempt, seems to be, that if the offense comes within the provisions of ch. 149, imprisonment may be imposed for a longer term than can lawfully be imposed under ch. 119.

Thus far we have considered these statutes with reference to criminal punishment alone.   But by ch. 149 the court is authorized, in certain cases of conviction for contempt, to award the injured party compensation or indemnity for the loss

or injury he has sustained by reason of the misconduct of the offender. Section 21 reads as follows: " If an actual loss or injury has been produced to any party by the misconduct alleged, the court shall order a sufficient sum to be paid by the defendant to such party, to indemnify him, and to satisfy his costs and expenses, instead of imposing a fine upon such defendant; and in such case the payment and acceptance of such sum shall be an absolute bar to any action by such aggrieved party to recover damages for such injury or loss."

The distinction between a proceeding which results in criminal punishment under ch. 119, or sec. 20 of ch. 149, and one which results in awarding indemnity to the injured party, is manifest and substantial. One is criminal in its character, the other civil; one is prosecuted by the state outside the particular cause in which the offense was committed (if committed in the progress of a cause), the other is a proceeding in the cause in which the offense was committed, or ancillary to it; one results in punishment by fine, or imprisonment, or both, inflicted to vindicate the authority and dignity of the court, which the defendant has contemned; the other in adjudging the offender to pay a sum sufficient to indemnify the injured party for the loss he has sustained by the misconduct of the offender, and to satisfy his costs and expenses. In the one case, the fine goes to the school fund, in the other the indemnity goes to the injured party; and an appeal lies to this court from the order requiring payment of the indemnity, but not from the order imposing a fine or imprisonment. *State ex rel. Chappel v. Giles*, 10 Wis., 101; *State ex rel. Mann v. Brophy*, 38 id., 414; *In re Murphey, supra.*

Because a conviction for contempt which results in the enforcement of a civil remedy by indemnity under section 21, is so essentially different from one which results in criminal punishment, the two proceedings cannot be blended in one. Were this otherwise — were it competent for the court in the same order to punish a contempt criminally, and also to award

indemnity to the injured party, — the portion of the order awarding indemnity could be brought to this court for review by appeal, while that portion which punishes the misconduct criminally could only be brought here by *certiorari* or writ of error. Civil and criminal proceedings can never thus be united and blended, at least not without the sanction of some positive statute. Hence, the final order in contempt proceedings must be one thing or the other; it must impose criminal punishment for the misconduct, or enforce the civil remedy by awarding indemnity. It cannot do both.

For the same reasons we cannot import the authority given in section 20, to imprison the offender (which is essentially criminal punishment), into section 21, which gives the civil remedy alone. To do so would be a gross violation of the rule which requires that such statutes shall be strictly construed. Section 21 does not authorize the court to punish the offender by imprisonment, and it expressly prohibits the imposition of a fine. We conclude, therefore, that in cases where indemnity is awarded under section 21, imprisonment cannot be imposed as a part of the punishment. Undoubtedly, under chapter 149 and perhaps other statutes, the court may, in such a case, commit the offender for nonpayment of the indemnity.

Whether the offender may be punished both civilly and criminally for the same contempt, we do not determine. We only hold that he cannot be so punished in the same proceeding.

The foregoing observations upon the different statutes concerning contempts and the punishment therefor, have been extended to greater length than was intended; but the examination of these statutes seemed necessary in order to give construction to section 23 of ch. 149, under which the petitioner was committed to prison.

An important question is, whether section 23 is applicable to cases in which the contempt is criminally punished, or whether its operation is confined to cases in which a civil remedy may be enforced. Regarding the title of the chapter

and the connection in which the section is inserted therein, we should have no doubt that it applies exclusively to the cases specified in section 21 — that is, to cases where loss and injury have resulted to a party by the misconduct of the offender, — were it not that the word *fine* is employed in it, and in the following section relating to the same subject. We have already seen that a *fine*, in the usual meaning of that term, can only be imposed when the offender is punished criminally for the contempt.

Our chapter 149 is mainly copied from the statute of New York on the same subject.    (2 R. S., 552, Part III, ch. VIII, title XIII, Edmonds' ed.)    Our sections 23 and 24 are exact transcripts of the New York statute.    But section 21 of the New York statute, corresponding to our section 21, provides that, "if any actual loss or injury shall be produced to any party by the misconduct alleged, a *fine* shall be imposed *sufficient to indemnify such party*," etc.    Hence, under that statute, the use of the word *fine* in sections 23 and 24 is entirely consistent with the view that those sections relate only to the enforcement of civil remedies.    We are of the opinion that the word as employed in our sections 23 and 24 (inadvertently, no doubt) means the *indemnity* of section 21, and nothing more. And we think further, that the remedy of those sections can only be obtained where the injured party has suffered loss or injury which, under proper circumstances, would entitle him to indemnity under section 21.    To state the last proposition in another form, we think that relief can only be given under section 23 in cases where "an actual loss or injury has been produced to a party by the misconduct alleged."

III. It is very clear that the "loss or injury" of the statute is a pecuniary loss, or injury to rights for which compensation may be made in money; a loss or injury which would entitle the injured party to maintain an action against the offender to recover damages for his misconduct.    This is made apparent

by the last clause of section 21, which renders the payment of the indemnity a bar to such an action.

Can Fred. P. Alter maintain an action against the petitioner to recover damages for the abduction and detention of the child? We are clearly of the opinion that he cannot. No rights of property are involved in the care and custody of the child. No paternal rights are enforced by the order in that behalf. The child is the ward of the court, and the care and custody of her was given to her father, not because he is her father, but because the court deemed it for the best interests of the child that he should be her custodian for the time being. The order was made exclusively in the interest of the child and for her benefit, and not in the interest or for the benefit of her father. Besides, the order is temporary and provisional in its nature, and may be changed at any time in the discretion of the court, if the welfare of the child will be thereby promoted. To-day, the father is the custodian; to-morrow, such care and custody may be transferred to the mother. The relation with which we have to deal, between the child and her custodian, is not that of father and child, nor yet that of master and servant. It is more nearly like that of guardian of the person and ward. In that relation the guardian is not entitled to the services of the ward. *Leech v. Agnew*, 7 Barr, 21; Hurd on Habeas Corpus, 44.

It follows from these views that the misconduct for which the petitioner stands committed, has not produced a loss or injury to Fred. P. Alter for which he may be indemnified under section 21; and because it has not, the court could not lawfully commit the petitioner for a continuing contempt under section 23.

IV. Thus far we have considered the question of the validity of the order under which the petitioner is imprisoned, just as we should have considered it were it before us on *certiorari* or appeal. We have reached the conclusion that the return of

the sheriff to the writ of *habeas corpus* shows the order to be one for the enforcement of a civil remedy in a case where criminal punishment alone can lawfully be inflicted, and hence that it is invalid. The question remains, whether the invalidity of the order is available to the petitioner in a proceeding by *habeas corpus*.

The general rule, as stated by Hurd, is, that " a proceeding defective for irregularity, and one void for illegality, may be reversed upon error or *certiorari;* but it is the latter defect only which gives authority to discharge on *habeas corpus* " (p. 327). This rule has frequently been applied to cases before this court, some of which are cited in *Semler's Case*, 41 Wis., 523. " Nothing will be investigated on *habeas corpus* except jurisdictional defects, or illegality as some courts and authors term it; by which is meant the want of any legal authority for the detention and imprisonment." By Dixon, C. J., in *Re Crandall*, 34 Wis., 179. And a remark of Mr. Hurd, that " it would be illegal to sentence a man to imprisonment for a crime punishable by a pecuniary fine only," is there quoted approvingly. Our statute provides, in effect, that a person brought up on *habeas corpus*, although in custody by virtue of civil process of a court legally constituted, or issued by an officer in the course of judicial proceedings before him authorized by law, shall be discharged " where the jurisdiction of such court or officer has been exceeded either as to matter, place, law or person; " or " where the process, although in proper form, has been issued in a case not allowed by law." R. S. 1858, ch. 158, sec. 19, subdivisions 1 and 4 (Tay. Stats., 1796, § 20).

If our construction of the several statutes relating to contempts is correct, it seems very clear that in this case the circuit court exceeded its jurisdiction both as to matter and law, when it attempted to enforce a civil remedy in a proceeding which could lawfully result in criminal punishment alone; and that the process of commitment, although in proper form

were it authorized by the subject matter of the proceedings, was issued in a case not allowed by law. Many cases are referred to by Mr. Hurd, which support his illustration of the test of jurisdiction quoted in *Re Crandall*. Hurd on Habeas Corpus, 327 et seq., and notes. If there is any distinction in principle between those cases and the proceedings under consideration, we have failed to detect it.

A broader range of inquiry on *habeas corpus* in a case where the imprisonment is for contempt than in other cases, has been suggested; and there are adjudications in the books which seem to sustain the suggestion. But it is quite sufficient for the exigencies of this case, to rest it upon the general rule above stated. Whether the distinction exists, will be left for determination when a case shall arise which necessarily involves the question.

It must be held that the invalidity of the order under which the petitioner is imprisoned, is available on *habeas corpus*.

V. It should have been said earlier in this opinion, that we think the order respecting the care and custody of the child, Lottie Alice Alter, is "a matter depending in the court," within the meaning of chapter 149; and hence, a violation of that order may be punished as a contempt under the statute. This results from the fact that the court has continuing power over the matter, and may at any time during the minority of the child make any order in respect to her care and custody which her welfare may require.

Upon the case made by the return of the sheriff, we conclude that the petitioner is illegally imprisoned. The demurrer to such return must therefore be sustained.

RYAN, C. J., *dissenting*. I. I cannot bring myself to believe this a case for the exercise of the original jurisdiction of this court.

The imprisonment was under an order of the circuit court for contempt; in my judgment, a contempt of very gross

character, which no court respecting its own jurisdiction or the safety of judicial administration could overlook; a contempt so deliberate, plain and undisguised, as, going unpunished, has a direct tendency to subvert judicial authority, and to encourage disregard and defiance of the orders and judgments of all courts; subordinating solemn adjudications to personal will and personal notions of right.

It may be that the circuit court erred in the proceeding under which the imprisonment was justified by the sheriff. If so, the imprisonment is a private wrong to the prisoner, purely personal to her; involving no public interest, no principle of more common interest to the state at large than any other error, of any circuit court, in any proceeding. It is a matter of purely private and personal right; as purely private and personal as the imprisonment of any individual in the state on proceedings for tort, crime or contempt. There is nothing in it of interest to any one except the parties to the litigation out of which it grew, or to give it the dignity of a public question.

It is far less a matter of public concern to the state at large than any case of *quo warranto* for local office, or arising on *mandamus*, injunction or *certiorari*, involving local public interest. These, in one aspect, concern the people at large; though this court has held that they do not so concern them as to justify the exercise of the original jurisdiction of this court. But the present case has no possible public aspect, except such as may be found in declamatory panegyric of the writ of *habeas corpus*, as distinguished from the other writs of which this court takes original jurisdiction, by one common grant, for one common purpose; a distinction not only not made in the constitution, but excluded by it.

I was necessarily absent from the court when *Re Semler*, 41 Wis., 516, was heard and decided; and, though my views were well understood, I was not present when the majority of the court considered the question of original jurisdiction, and

decided to assume it, in this case. I have, therefore, no light on the grounds on which original jurisdiction is assumed, further than the opinions of the court give it. And it appears to me — I say it with great deference — that, in both cases, the principles on which the original jurisdiction of this court rests, were apparently overlooked entirely

Many eulogies on the writ of *habeas corpus* have been uttered, and it is easy to utter them. But popular notions of the sanctity of the writ should not enter into judicial determination of jurisdiction to issue it. In England, when the writ was introduced, and for long afterward, it was largely essential to personal liberty; though the courts and officers having jurisdiction of it were comparatively small in number. It may well be said to be essential to personal liberty in this country, in extraordinary times, of military or other usurpation of power. Indeed it is, in all times, and in all countries where it prevails, though often abused, an important writ, which a free people will never consent to surrender or to see suspended without distrust and condemnation. But, in this country, in all ordinary times, it is a writ important to private, not to public liberty. And in this state it may be said to be a cheap and common writ; as readily obtained from courts and officers having jurisdiction of it throughout the state, as any other judicial process. In every circuit in the state there is one judge, and in every county there are at least one court, one judge and one or more court commissioners, with power to issue it. Jurisdiction of the writ, for the protection of private right, in Mr. Justice COLE's words in *Re Semler*, "as the best safeguard of personal liberty," is sown broadcast throughout the state. And no prisoner, in ordinary circumstances, need go beyond his own vicinage to obtain it. Whenever the writ is issued by local courts or magistrates, proceedings under it may be reviewed in this court upon proper writ. But it is difficult to perceive — to me impossible — why original jurisdiction in this court is necessary, im-

portant or useful in cases of purely private right, of a writ of which local jurisdiction is so multiplied; or why this court should abandon its primary appellate character to entertain concurrent jurisdiction of it with every court, judge and court commissioner in the state. The value of the writ, however great, has nothing to do with the question of jurisdiction to issue it. Courts may sympathize with popular superstition of the sanctity of the writ. But no sanctity, no sympathy, no superstition, can stand for jurisdiction or aid it.

Doubtless this court can entertain original jurisdiction of the writ in a proper case. But it is not to be overlooked that the jurisdiction of this court of this writ is concurrent with its jurisdiction of *mandamus, injunction, quo warranto, certiorari* and other original and remedial writs; all embraced, as already noticed, in one common grant, for one common purpose; all to proceed upon common principles; all subject to common limitation; the jurisdiction of each being coëxtensive and identical with jurisdiction of the rest. The ground of original jurisdiction of all the writs is essentially the same. The right, public or private, sufficient to put in motion original jurisdiction of any one of these writs, is sufficient to put in motion original jurisdiction of all of them. That is the constitution. Any distinction of the writ of *habeas corpus* from the other writs has no warrant in the constitutional grant of jurisdiction; no warrant outside of a sympathetic imagination.

The nature and extent of the original jurisdiction of this court has not been always clearly understood or clearly defined But all the cases in this court from *Attorney General v. Blossom*, 1 Wis., 317, down to *Re Semler*, 41 id., 516, recognize the common grant of all the writs, as a single jurisdiction by different writs, for common objects. After speaking of the several writs in detail in *Attorney General v. Blossom*, the late Mr. Justice SMITH remarks: "These writs differ essentially, in their character and objects, from ordinary writs is-

sued by the courts in the regular and usual administration of
the law between parties.   They go to accomplish peculiar and
specific objects, carrying with them the special mandate of
the sovereign power, addressed to the person, corporation or
officer, requiring them to do or not to do, to proceed, or to de-
sist, to perform the duty required by law, or to abstain from
the exercise of powers without lawful authority, etc.   They
bear no resemblance to the usual processes of courts, by which
controversies between private parties are settled by the judi-
cial tribunals of every grade."   And the opinion in that case
deals throughout with all the writs as prerogative writs, given
to this court for prerogative jurisdiction; several writs, but
one jurisdiction.

In cases of original jurisdiction, there is some confusion in
the judgments of this court between *Attorney General v.
Blossom* and *Attorney General v. Railroad Companies*, 35
Wis., 425; the court assuming or declining jurisdiction with-
out any apparent general rule.   Indeed, as has been said by
eminent counsel at the bar, the original jurisdiction of this
court, its objects and limits, were never fully considered or
determined before *Attorney General v. Railroad Companies.*
That was the first application to this court, in its original juris-
diction, for the writ of injunction.   And the whole scope of
original jurisdiction was forced upon the court, for the reason
that injunction, unlike the other writs, was at the common law
in no sense an original writ.   It was argued at the bar that
the writ of injunction gave to this court general equitable
jurisdiction, in all cases, between all parties, where perpetual
injunction is the relief sought.   The court held, however, that
" an original equitable jurisdiction, however restricted, of
purely private causes, concerning private interests, between
private persons, would be wholly inconsistent with the mani-
fest policy of the constitution to limit this court to appellate
jurisdiction, superintending control over inferior courts, and
original jurisdiction in certain causes *publici juris*, as is held

in *Attorney General v. Blossom.*" And it was held that the
writ of injunction, grouped with the other writs, is to be con-
sidered a *quasi* prerogative and *quasi* original writ for equit-
able prerogative jurisdiction, appertaining to "original juris-
diction of certain proceedings at law and in equity, to protect
the general interests and welfare of the state and its people,
'which it would not do to dissipate and scatter among many
inferior courts.'" And of the three branches of jurisdiction
of this court, appellate, superintending, and original, it is said:
"Here are three jurisdictions, but one policy: to make this
court indeed a supreme judicial tribunal over the whole state;
a court of last resort on all judicial questions under the con-
stitution and laws of the state; a court of first resort on all
judicial questions affecting the sovereignty of the state, its
franchises or prerogatives, or the liberties of its people." And
the ground of jurisdiction in that case, essential to its exercise,
is thus stated:

·"This view excludes jurisdiction of injunction in private
suits, between private parties, proceeding on private right or
wrong. In excluding them, we feel quite assured that we are
only giving effect to the very purpose and limit of the consti-
tution in the grant of jurisdiction. . . . In our view, the
jurisdiction of the writ is of a *quasi* prerogative writ. The
prerogative writs proper can issue only at the suit of the state,
or the attorney general in the right of the state; and so it
must be with the writ of injunction in its use as a *quasi* pre-
rogative writ. All may go on the relation of a private person,
and may involve private right. It is the duty of the court to
confine the exercise of its original jurisdiction to questions
*publici juris.*" These were not the words of the writer.
They express the judgment of the court, "ascertaining and de-
fining the jurisdiction in question for the future guidance of
the court and the profession, until our construction should be
modified or changed by our successors."

And it is added, by way of illustration, of the jurisdiction

In re Ida Louisa Pierce.  (Habeas Corpus.)

of the same writs given to the circuit courts: "It is impos-
sible for a lawyer to suppose that they are granted in the same
sense and with the same measure of jurisdiction, to this court
as to those courts.  Such a proposition would shock the legal
sense of any professional man.  And the distinction is to be
looked for, and is readily found, in the general constitution
and functions of those courts and of this.  The writs are given
to the circuit courts as an appurtenance to their general origi-
nal jurisdiction; to this court, for jurisdiction.  Those courts
take the writs with unlimited original jurisdiction of them,
because they have otherwise general original jurisdiction.
Other original jurisdiction is prohibited to this court, and the
jurisdiction given by the writs is essentially a limited one.
Those courts take the prerogative writs as part of their general
jurisdiction, with power to put them to all proper uses.  This
court takes the prerogative writs for prerogative jurisdiction,
with power to put them only to prerogative uses proper."

And all this is said of the entire group of writs, *habeas
corpus* included; necessarily said, because they are essentially
inseparable in the grant of jurisdiction.  That is settled by
the constitution itself, which marries them together beyond
the power of any court to divorce them.  Ground of jurisdic-
tion for one writ is ground of jurisdiction for all.

In *Att'y Gen. v. Eau Claire*, 37 Wis., 400, the state filed
an information in this court to enjoin an obstruction of a pub-
lic navigable river.  The court assumed original jurisdiction
on this ground:

"What are properly local highways, in the sense we have
been considering, are generally within the limits of one mu-
nicipality, existing under its authority, in charge of its officers.
These may generally be left to the protection of local author-
ities and local jurisdictions.  Public rivers are highways by
no local authority; and are rarely, if ever, within the munici-
pality or in charge of its officers.  They are in charge of the
state, and the state cannot abdicate its charge of them.  That

charge is a duty to the federal government, and a trust for the whole people, not of the state only, but of the several states. An unauthorized encroachment upon any of them is a violation of the duty assumed by the state, in its aggregate and sovereign character, to keep them forever open.    Every such encroachment is a *pourpresture*, which concerns the sovereign prerogative of the state, and the prerogative jurisdiction of this court.    Original jurisdiction of such cases here is too manifest for discussion."

That case involved a question of illegal municipal taxation. And it was argued at the bar that that alone was ground of original jurisdiction here.    But the court rejected it, saying: "In ordinary cases, this court will not extend its original jurisdiction to restraint of local, municipal taxation for alleged irregularity or want of authority.

"We assent to what was said by counsel for the information, of the nature of municipal corporations, and of their relations to the state, and of the part they play in the administration of the state.    Of course every question of municipal taxation is *publici juris*.    But it is equally so whether it be raised by a tax-payer, or by the municipality, or by the state. It is not enough to put in motion the original jurisdiction of this court, that the question is *publici juris;* it should be a question *quod ad statum reipublicæ pertinet;* one 'affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people.'    *Attorney General v. Railroad Companies*, 35 Wis., 425.

"It was repeated in that case, as it had been held in *Attorney General v. Blossom*, 1 Wis., 317, that 'this court takes the prerogative writs for prerogative jurisdiction, with power to put them only to prerogative uses proper.'    Prerogative writs often go in aid of private right, or of local public right. But the original jurisdiction of this court is not only limited to the prerogative writs, but is confined to prerogative causes. The word properly implies sovereign right.    Jacob defines it

In re Ida Louisa Pierce. , (Habeas Corpus.)

as ' that power, preëminence, or privilege, which the king hath and claimeth over and beyond other persons, and above the ordinary course of the common law, in right of his crown.' And so we find the object of the prerogative jurisdiction of this court declared in *Attorney General v. Blossom:* 'Contingencies might arise wherein the prerogatives and franchises of the state, in its sovereign character, might require the interposition of the highest judicial tribunal to preserve them.' And, though the question did not arise in the case, it is quite evident from all that has any bearing on it in *Attorney General v. Railroad Companies,* that to bring a case properly within the original jurisdiction of this court, it should involve, in some way, the general interest of the state at large. It is very true that the whole state has an interest in the good administration of every municipality; so it has in the well-doing of every citizen. Cases may arise, to apply the words of C. J. STOW, geographically local, politically not local; local in conditions, but directly affecting the state at large. Cases may occur in which the good government of a public corporation, or the proper exercise of the franchise of a private corporation, or the security of an individual, may concern the prerogative of the state. The state lends the aid of its prerogative writs to public and private corporations, and to citizens, in all proper cases. But it would be straining and distorting the notion of prerogative jurisdiction to apply it to every case of personal, corporate, or local right, where a prerogative writ happens to afford an appropriate remedy. To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character; this court judging of the contingency in each case for itself. For all else, though raising questions

*publici juris,* ordinary remedies and ordinary jurisdictions are adequate. And only when, for some peculiar cause, these are inadequate, will the original jurisdiction of this court be exercised for protection of merely private or merely local rights. . . .

" It was with these views that we declared the rule in *Attorney General v. Railroad Companies,* that all cases of original jurisdiction must proceed upon leave, showing *prima facie* ' that the case is one of which it is proper for this court to take cognizance.' And these were not altogether new views of the jurisdiction, as counsel seem disposed to think. As early as *May v. Keep,* 1 Chand., 285 (2 Pin., 301), approved in *Hurlbut v. Wilcox,* 19 Wis., 419, this court refused a writ of *certiorari,* because the circuit court had jurisdiction. And though the writs in these cases appertained to the appellate jurisdiction of the court, the reason applies equally to writs within the original jurisdiction. In cases of *mandamus,* the court made a rule in 21 Wis., 694, and enforced it in *State v. Haben,* 22 Wis., 101, applying in terms to cases of original jurisdiction, that the writ should not issue here when there is ample remedy in the circuit court. And there have been several instances since of refusal to issue both writs.

" These cases rest, indeed, upon the concurrent jurisdiction of the circuit court. But the distinction is practically the same. In all cases of purely private or local interest, the jurisdiction of the circuit court is *prima facie* adequate. If it be inadequate in any case, it must generally be so because the interest in litigation is something more than private or local."

These cases were followed by *State v. Baker,* 38 Wis., 71. I have since been sometimes inclined to doubt whether the court did well in assuming original jurisdiction in that case. Be that as it may, there is nothing in that case to support this. It went upon the inadequacy of jurisdiction in the proper circuit court; in fact, upon a surcease of local justice,

In re Ida Louisa Pierce.   (Habeas Corpus.)

of which there is no pretense in this case. The opinion of the court quotes from *Attorney General v. Eau Claire* the passage cited above, and reaffirms the doctrine. The ground of jurisdiction is thus stated:

"These cases, involving title to county offices, would undoubtedly be within the rule forbidding the exercise of original jurisdiction of them here, in ordinary circumstances. And the question arises, whether there is any peculiarity affecting them which brings them within the exception. For it is obvious that the rule stated in *Attorney General v. Eau Claire* reserves a discretion to the court to exercise original jurisdiction of such cases, when peculiar conditions bring them within the spirit and object of the jurisdiction, or render the jurisdiction of the circuit court inadequate.

"Whether the conduct of the county canvassers, presently considered, raises a 'contingency requiring the interposition of this court,' need not be determined. It was upon another ground that we gave leave to bring the cases here, and that we now sustain the exercise of original jurisdiction of them.

"When the leave was given, it appeared that the election and canvass involved in these cases were the same that were in question at the last term in *State ex rel. McDill v. Board of State Canvassers*, 36 Wis., 498, and that the distinguished gentleman who was the judge of the circuit court in which these cases must be brought, if not brought here, was directly interested in the questions involved in them; his title to a high office depending more or less upon them. The relators not unreasonably objected to bring their cases before him; and our high respect for him forced us to believe that he would object no less. He was, perhaps, disqualified in law, he was surely disqualified in propriety, from sitting judicially in these cases; and we felt warranted in believing that he would refuse to act in them. The terms of office involved were brief and fast passing away. We thought then, and hold now, that we could not with judicial propriety subject

the relators, or the county whose officers *de jure* they claimed to be, to the partial denial of justice which would arise from the proper refusal of the learned judge of the circuit court to sit in these cases.   For this peculiar cause, the jurisdiction of the circuit court was plainly inadequate.   And, indeed, such an obstruction, so caused, of the justice which is a sovereign attribute; such a defeat, so caused, of timely effect of a constitutional election; such an interruption of an ordained and radical process by which the sovereignty acts, appear to us to concern the sovereign prerogative, to raise, in Mr. Justice Smith's words, a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state.   For these reasons, we have no doubt of our duty, within the rule of *Attorney General v. Eau Claire*, to exercise original jurisdiction of these cases."

This doctrine was again affirmed in *State v. Doyle*, 40 Wis., 175, in which the court thus defines the grounds and limits of its original jurisdiction:  " So far as the private right of the relator is concerned, it is now well settled that this court would not assume original jurisdiction to enforce it.   *Attorney General v. Railroad Cos.*, 35 Wis., 425; *Attorney General v. Eau Claire*, 37 id., 400; *State v. Baker*, 38 id., 71; *State v. Supervisors*, id., 554.   But, as it is said in *Attorney General v. Railroad Cos.*: ' In a government like ours, public rights of the state, and private rights of citizens, often meet, and may well be involved in a single litigation.   So it may be in the exercise of the original jurisdiction of the court.'  ' The prerogative writs can issue only at the suit of the state, or the attorney general in the right of the state.' ' They may go on the relation of a private person, and may involve private right.'  And the question before us is not upon the private right of the relator, and is independent of the accident that there is a relator in the case.   The question on which the exercise of jurisdiction here must turn, is, whether the subject matter of the writ is one ' *quod ad statum*

*reipublicæ pertinet;* one affecting the sovereignty of the state, its franchises or prerogatives.' *Attorney General v. Eau Claire.*" See also *State v. Supervisors*, 38 Wis., 554, in which Mr. Justice LYON discusses original jurisdiction in the same view and to the same effect, the court refusing to exercise original jurisdiction of *mandamus* to enforce local official duty, which, though *publici juris*, did not concern the people of the state at large.

The scope and object of the original jurisdiction of this court are very clearly limited and defined in these cases. The construction of the jurisdiction, essentially alike in all of them, though differently applied, was very solemnly considered and determined, and appears to me to be of too grave and weighty a character to give way to any sentimental view of the sanctity of the writ of *habeas corpus*, of which such plenary jurisdiction pervades every county in the state. And it is matter of profound surprise to me that this should be held a proper case for original jurisdiction within the rules of the cases cited; or that it should be considered that " the essential grounds, or many of them, upon which those cases went, are present in this." I cannot understand how this could be gravely said, except in entire forgetfulness of the doctrine of those cases.

The only ground found in the opinion of the court, for bringing this within those cases, is thus stated in the opinion: "The interest of the state in the personal liberty of its citizens is primary and proximate, and to secure such liberty to each citizen entitled thereto is one of the most important purposes of government. 'All men are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness. To secure these rights, governments are instituted among men.' Const., art. I, sec. 1." This appears to be a very cavalier disposition of a very grave question; perhaps the best of which the case admitted.

It is unnecessary to comment on the citation of one of the abstractions from the state constitution, as they are called by the late Judge Redfield, who remarks that they have been regarded as mere glittering generalities.   Aside from all such, the state, as a sovereignty, owes protection to all its indwellers, in life, liberty and property, and — so far — in the pursuit of happiness.   And if this court can take original jurisdiction to enforce the protection which the state owes to all within it in any of these particulars, it must take original jurisdiction to enforce that protection in all; not by *habeas corpus* only, but by *mandamus*, injunction, *quo warranto*, *certiorari*, and other necessary original and remedial writs.   If the writs named are for prerogative uses only, so are the original and remedial writs.   *Noscitur a sociis.*   But if the writs named may go at private suit, to enforce personal right or to redress personal wrong, the " other original and remedial " will embrace all process necessary for that purpose.   That would make this court one of general original jurisdiction.   I do not see on what principle, if this prisoner may have her private remedy, under the original jurisdiction of this court, against the order of commitment, she should not equally have her private remedy under it for what the majority of the court holds to be a false imprisonment.   *Attorney General v. Railroad Companies.* I feel, with great deference, compelled to say, that the position appears to me too absurd for discussion.

The interest of the state in the personal liberty, life, property and general welfare of each of its citizens is identical; equally primary and proximate.   These personal rights of citizenship differ in importance to the citizen; but the duty of the state in protecting them is the same.   It owes the same protection to property that it does to life and liberty, whatever their relative importance may be in a private sense.   It owes all the protection it can give equally to all of them.

It seems to me, that the opinion confounds the personal freedom from restraint of each citizen, with the liberties of

In re Ida Louisa Pierce.   (Habeas Corpus.)

the people.   The phrase, liberties of the people, in a judicial sense, means the aggregate political rights and franchises of the people of the state at large.   The liberties of the people are not necessarily, are indeed rarely, involved in the imprisonment of an individual.   They were undoubtedly in *Re Kemp*, 16 Wis., 359.   That question must always rest in the cause and nature of the imprisonment, which may be of a character to involve the constitutional right of the whole people; as in *Re Kemp*, military usurpation of judicial authority throughout the state.   But, in the ordinary proceedings of courts, the imprisonment of an individual has no relation to the liberties of the people; does not impair or affect them. True liberty rests in the supremacy of just law, judicially administered.   The liberties of the people, here and elsewhere, are not only essentially subject to the ordinary processes of the courts, not only unimpaired by them, but are absolutely dependent upon them.   Liberty not subject to judicial process would be anarchy: the worst form of tyranny, with no security for life, liberty, property or the pursuit of happiness.   The supremacy of ordinary judicial processes enters into the liberties of the people, and is essential to them.   Order is essential to all liberty.   And judicial supremacy is essential to all order.   The liberties of the people remain untouched, though one or many of them be imprisoned for tort, or for crime, or for contempt.   The proceeding may be erroneous, or even void; but that makes the imprisonment a private, not a public wrong.   The common jails of the several counties are not an infringement upon the liberties of the people; and if any are confined in them wrongfully, upon ordinary civil or criminal process, it is a purely private wrong, for which there is ample remedy before local courts and local magistrates.

The opinion of the court in this case appears to affirm the doctrine of *Attorney General v. Railroad Companies, Attorney General v. Eau Claire*, and *State v. Baker*, but it none the less undermines, no doubt inadvertently, the radical prin

ciple which those cases determined to be the limit of original jurisdiction in this court.   Those cases confine it to proceedings on behalf of the state, to enforce a public right, or to redress a public wrong, affecting the sovereignty of the state, or some common interest of the people of the state at large. No doubt the court would grant a writ of *habeas corpus*, on proper application in the name of the state, in a proper case, such as Kemp's.   For the writ need not issue on the petition of the prisoner.   Hurd, 202–3.   But the writ here is a private remedy, by a private person, for a private wrong.

The disregard of the opinion for the cases which it professes to follow, appears to me unaccountable.   I regret it profoundly.   It has been my ambition, since I have been honored with a place in this court, that, during the brief time I could expect to remain here, all the judgments of this court should rest upon fixed principles; should proceed upon general rules governing all cases, not upon particular rules framed for particular cases; that all should be in accord in principle, not vibrating to this side or that of a general principle, according to the particular view taken of each particular case.   *Misera servitus, ubi jus vagum.*   Judicial authority is but an illusion when the rules of judicial decision are precarious and wavering.   I can only hope that the judgment in the present case may not stand as a new precedent for wavering rules of decision.

Besides appellate and original jurisdiction, the constitution gives this court a general superintending control over all inferior courts.   All the cases on the subject, from *Attorney General v. Blossom* down, recognize this power as a distinct jurisdiction.   I know of no case in which it has been defined, except some loose remarks in *Attorney General v. Blossom*. If the proceeding of the circuit court be as erroneous as is held in the opinion of the court, it may be that it might be reviewed upon this writ, under the power of superintending control over the circuit court.   Upon that question I have

formed no opinion.   It is a very interesting one, which I would have liked to have heard argued at the bar.   And I suggested this view.   But the majority of the court resolved to support the writ, at all risk, under the original jurisdiction

II.   I cannot bring myself to believe that, in a court having jurisdiction of it, the writ of *habeas corpus* gives jurisdiction to review the proceedings of the circuit court in which the commitment was made.

Everything is presumed in favor of the judgment of a court having jurisdiction of the person and of the subject matter; especially of a court of general jurisdiction.   The judgment of a court having jurisdiction of the person and of the subject matter, however erroneous, can not be impeached collaterally.   Generally it can be reviewed only by a court having appellate jurisdiction, acting within such jurisdiction by direct appellate proceeding; though, in exceptional cases, such a judgment may be impeached in another court of coördinate jurisdiction, but only by direct proceeding taken to impeach it.   *Huebschman v. Baker*, 7 Wis., 542.   The validity of erroneous judgments, while they stand unreversed, has been repeatedly affirmed by this court.   The late case of *Eaton v. Youngs*, 36 Wis., 171, is a very strong one.   The circuit court had given judgment of foreclosure and sale for the whole amount of a mortgage debt, before the greater part had become due, and personal judgment over for deficiency: a manifest injustice and abuse of jurisdiction.   Some years subsequently, perceiving the error, the circuit court made an order vacating the judgment for deficiency.   But, on appeal from that order, this court held that the circuit court had lost jurisdiction to vacate its own judgment, and held the judgment valid while it stood, saying: "We cannot, on this appeal, inquire into the correctness of the judgment below.   It is obvious that the court below had jurisdiction of the cause, and therefore to render the judgment.   The judgment may be erroneous, but it is not void.   This seems very plain.   And it could be reviewed

here only by an appeal directly from it." A still later case, amongst many to the same effect, is *Rasmussen v. McCabe*, 43 Wis., 471, sustaining the validity of a justice's judgment appearing on its face to have been prematurely rendered. "It might tax the ingenuity of most justices of the peace to produce a more confused or eccentric docket of a proceeding and judgment. But a judgment was rendered by the justice here, within his jurisdiction, however erroneous." And a sale under the judgment was sustained.

This rule prevails in cases of *habeas corpus*, as in all others where judgments come collaterally in question. The broadest rule which can prevail on *habeas corpus* is that held on common-law *certiorari*. In the latter case, the rule is well settled in this court that the writ will not raise questions of abuse of jurisdiction, errors in law, "errors, so to speak, which the court had jurisdiction to commit;" but only questions of jurisdiction of the person and of the subject matter. *Varrell v. Church*, 36 Wis., 318.

And this very rule is equally well settled as applied to writs of *habeas corpus*. *Re Blair*, 4 Wis., 522; *Re O'Connor*, 6 id., 288; *Re Perry*, 30 id., 268; *Re Crandall*, 34 id., 177; *Re Semler*, 41 id., 517. *See Hauser v. State*, 33 id., 678.

The opinion of the court in this case concedes jurisdiction in the circuit court of the person and of the subject matter; concedes the contempt of the prisoner; concedes the power of the circuit court to punish it; but proceeds *arguendo* to hold that the circuit court erred in the exercise of its jurisdiction. That question was not properly before the court in this proceeding.

In discussing the errors imputed to the circuit court, in the proceeding which led to the commitment of the prisoner, the opinion of the court appears to set out with a grave error. It seems to imply that the doctrine of contempt was invented, and the power of courts to punish for it is a special power conferred, by statute; considering the statute as one creating

In re Ida Louisa Pierce. (Habeas Corpus.)

*quasi* statutory offenses, and therefore to be strictly construed. This appears to me a great mistake. The power is inherent in all superior courts, as an incident of their existence. This is so generally recognized that, as far as I have seen, it is rarely discussed in modern cases. But in *Watson v. Williams*, 36 Miss., 331, as late as 1858, there is an able and elaborate review of the subject, which I cannot do better than quote at some length, especially as it covers another aspect of this case presently considered.

" ' The process of attachment for contempts must necessarily be as old as the laws themselves. For laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power, therefore, in the supreme courts of justice, to suppress such contempts by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. Accordingly we find it actually exercised as early as the annals of our law extend.' 4 Black. Com., 286.

" The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coëxisting with them by the wise provisions of the common law. · A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments or decrees against the recusant parties before it, would be a disgrace to the legislation and a stigma upon the age which invented it. In this country, all courts derive their authority from the people, and hold it in trust for their security and benefit. In this state, all judges are elected by the people, and hold their authority, in a double sense, directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents. It is the authority and laws emanating

from the people, which the judges sit to exercise and enforce. Contempts against these courts in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law, whom they employ in the conduct of their government. The power to compel the lawless offender against decency and propriety to respect the laws of his country, and submit to their authority (a duty to which the good citizen yields hearty obedience, without compulsion), must exist, or courts and laws operate at last as a *restraint* upon the upright, who need no restraint, and a license to the offenders, whom they are made to subdue.

"Chancellor KENT, in the case of *Yates*, 4 Johns., 353, in concluding a review of the English cases on this subject, says: 'The trust is given to the courts, not for themselves, but for the public, who are deeply interested in the preservation of this power in ·its accustomed vigor.'....

"'Mr. Justice BLACKSTONE pursued the same train of observation, and declared that all courts, by which he meant to include the two houses of parliament and the courts of Westminster Hall, 'could have no control in matters of contempt; that the sole adjudication of contempts, and the punishments thereof, belonged exclusively, and without interfering, to each respective court; that infinite confusion and disorder would follow if every court of the Hall should have power to examine the commitments of the other courts for contempts; that the judgments and commitments of each respective court, as to contempts, must be final and without control. It was a confidence that might, with perfect safety, be confided in the judges and the houses of parliament. That the objection, as to abusive consequences, proved too much, because it was applicable to all courts of dernier resort; and general convenience must always outweigh partial inconvenience.'....

"Chancellor KENT, after these citations, adds: 'I have cited the opinions of other judges much at large, because I could not hope to improve upon the strength of their observa-

In re Ida Louisa Pierce. (Habeas Corpus.)

tions; and I entertain the most perfect conviction that the law, as they declared in this case, was well understood, and definitely established as part of the common law of England at the time of our revolution. Mr. Justice GROSE, many years afterwards, thought he did enough to prove the settlement of the law on this subject, by merely quoting this very able decision of Lord Chief Justice DE GREY.'

"This decision, and the reasoning employed by the judges, is adopted and fully sanctioned by the supreme court of the United States in *Ex parte Kearney*, 7 Wheat., 38, in an able opinion delivered by Judge STORY.

"These cases were also considered and reviewed by COWEN, J., in the supreme court of New York, and approved as declarative of the common law of England. He says, 'that it was agreed in the *Mayor of London's Case* (Crosby), 3 Wilson, 188, that in cases of commitment for contempt by the lords or commons, or by any other court of general jurisdiction, no other court had power to interfere and relieve by *habeas corpus*, or in any other way, because there was no appeal.' BLACKSTONE, J., said, 'the sole adjudication of contempts, and the punishment thereof, in any manner, belongs exclusively, and without interfering, to each respective court.'

"'The right of punishing contempts by summary conviction is inherent in all courts of justice and legislative assemblies, and is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our state constitution. The discretion involved in this power is in a great measure arbitrary and undefinable, and yet the experience of ages has demonstrated that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice.

"'The known existence of such a power prevents in a thousand instances the necessity of exerting it, and its obvious liability to abuse is, perhaps, a strong reason why it is so seldom transcended. This power extends not only to acts which

directly and openly insult or resist the powers of courts, or
the persons of the judges, but to consequential, indirect and
constructive contempts, which obstruct the process, degrade
the authority, or contaminate the purity of the courts.    4
Black. Com., 280; 2 Hawk. Pl. Cr., b. 2, c. 22; 1 Com. Dig.,
Attachment, A.'

"So in Mississippi, the power of the courts to fine and
imprison for contempt, as a necessary incident of judicial
power, independent of statutory enactment, inherent in the
very nature of their organization, and derived from the con-
stitutional provision which gave them being, *ex necessitate rei*,
has been repeatedly recognized by her judicial tribunals."

And the court refers, amongst other cases, to *Johnston v.
Commonwealth*, 1 Bibb, 598, and quotes from it this passage:
"To this end, a power in courts of justice to suppress con-
tempts and disobedience to their authority, by immediate pun-
ishment, is essentially necessary, and results from the first
principles of judicial establishments.    Laws are necessary to
the good order of society.    Courts are ordained by the laws
as necessary for their due administration.    Hence due respect
for the courts of justice is as necessary as a regard for the
laws themselves."

So the supreme court of New Hampshire held in 1859:
"The authority to punish contempt is a necessary incident,
inherent in the organization of all legislative bodies and of all
courts of law or equity, independent of statute provisions."
*State v. Matthews*, 37 N. H., 450.

The constitution of the state, in creating this court and the
circuit courts, as courts of record, vested in them *ex vi ter-
mini* this common-law power to punish for contempt; as an
absolute and essential quality of superior courts, as much as
the power to sit in judicial order, with open doors, in public
session.    I do not question that this power may be regulated
by statute.    But no statute could be effectual to take it away;
no statutory regulation can be effectual so to abridge, impair

In re Ida Louisa Pierce.   (Habeas Corpus.)

or cripple it, as to leave the courts without effectual power effectually to punish, as for contempt, disregard of the respect due to judicial administration, and disobedience of judicial determination.   And, if the statute regulating contempts fails to make adequate provision for the contempt of the prisoner, I cannot doubt that the circuit court took adequate common-law power with its creation by the constitution.   In this respect, neither this court nor the circuit courts are at the mercy of the legislature.   And if every statute of the state providing for the punishment of contempts should be repealed, and another passed purporting to abolish the power, the power would survive, as it was at the common law, by force of the constitution itself.   The legislature cannot destroy, the courts cannot abdicate, this judicial power, essential to the exercise of all other judicial powers, essential to all judicial authority.

It is not my purpose to examine the statutes relating to contempts in detail, or to criticise their provisions by the standard of the common-law power inherent in courts by force of the constitution.   It is proper to say, however, that I have no doubt of the power or wisdom of the legislature in extending the appellate power to judgments for contempt. This does not impair the power in the circuit courts, any more than appellate jurisdiction does any other judicial power, and goes far to prevent abuses.   I shall content myself with following, as far as necessary, the discussion of the statutes in the opinion of the court.

The opinion, right or wrong in its conclusions, appears throughout as the opinion of a court exercising appellate jurisdiction, and reversing for error.   It holds that the authority to commit the prisoner must be found, if at all, in sec. 23, ch. 149, R. S. 1858. I have already sufficiently indicated my opinion that the authority need not necessarily be found in that or any other section of the statute.   But I will consider the opinion on its own premises, and assume that the section in question

is the only authority.    The opinion proceeds to hold that the
section in question has relation only to pecuniary rights for
which compensation may be made in money; and that it could
not cover the loss of the father's custody of the child by the
mother's taking it in violation of the judgment of the circuit
court.    I am not satisfied that this construction is correct.
The statute does not certainly so read; and the conclusion
rests in construction, perhaps somewhat forced construction,
of the terms used.    The circuit court, in the view taken in the
opinion of this court, gave the section a different construction.
If that construction were wrong, it would plainly and obvi-
ously be mere judicial error; not usurpation or even abuse of
jurisdiction; but as purely error as any of the various miscon-
structions of various statutes by the circuit courts, for which
this court reverses judgments and orders as erroneous, but
holds valid until reversed.    Every volume of the reports of
this court, of all courts, bears witness to this view.    And it
would be waste of time to enlarge upon it.

The opinion of the court distinguishes between criminal
contempts proper punished by fine, and contempts punished
for recompense of the injured party; and holds that both may
not be done in one proceeding.    I doubt the correctness of
this position; more especially because the opinion finds it
necessary to the position, to emasculate the technical word
*fine* in secs. 23 and 24, ch. 149, and to make it read as civil
indemnity to the injured party.    This again is a question of
statutory construction, on which this court and the circuit
court differ; and if the circuit court were wrong, is pure error.
The opinion does not hold that circuit courts cannot punish
one and the same act as a criminal contempt by fine or impris-
onment, and by awarding indemnity to the injured party.    I
have little doubt that they may.    So the circuit court also ap-
pears to have held.    And if both are improperly done in the
same proceeding, that is an irregularity only; not a want or
excess of jurisdiction.    In a late case, it was held by this court

that it was error only, not jurisdictional, to render two judgments between the same parties, on the same subject matter, which the statute authorized the court to render in one judgment only. *Scott v. Reese*, 38 Wis., 636. *A fortiori*, is it error only to render one judgment, in one proceeding, on the same subject matter, against the same party, for which the court had power to render two several judgments. This is expressly ruled in *Rasmussen v. McCabe*, 43 Wis., 471. In both cases the judgment may be reversed for irregularity, but in neither can be impeached for want of jurisdiction.

The distinction between mere error in the commitment of a prisoner, and want of jurisdiction to commit him, was sharply drawn in this court in *Re Crandall*, 34 Wis., 177. The prisoner was convicted of a simple assault, punishable by fine *or* imprisonment; but was punished by fine *and* imprisonment, as for an assault and battery; and at the time of his petition had served his term of imprisonment, and was detained only for nonpayment of the fine. The sentence obviously appears to have been erroneous, and beyond the authority of the court upon the actual conviction. The court had power to sentence to fine and imprisonment upon another conviction, but not on the conviction which was had. It erred in the sentence of the prisoner, by excess of punishment. The language of Dixon, C. J., happily illustrates the distinction of which I have been speaking. "It is conceded that for mere error, no matter how flagrant, the remedy is not by writ of *habeas corpus*. For error the party imprisoned must prosecute his writ of error or *certiorari*. Nothing will be investigated on *habeas corpus*, except jurisdictional defects, or illegality as some courts and authors term it; by which is meant the want of any legal authority for the detention or imprisonment. The defect here complained of is not jurisdictional. It was at most mere error. There was authority of law expressly given by statute for the sentence pronounced by the circuit court against the petitioner. We can best illustrate

our view that the objection is not jurisdictional, by supposing
that the question had been raised on the trial of the petitioner,
whether a verdict and conviction for assault and battery could
be had on an indictment which charged only an assault. If
the question had been so raised, and the circuit court had de-
cided that the indictment was sufficient for that purpose, that
such verdict and conviction could be had, and had so instruct-
ed the jury, would that have been a mistake going to the juris-
diction? If a petition for discharge by *habeas corpus* had
been presented setting forth those *facts*, could the petitioner
have been liberated? We are clearly of opinion that the mis-
take would not have been jurisdictional, and that the petitioner
could not have been discharged. It is obvious that the case
as now presented does not differ, or give rise to the applica-
tion of any different rule. It is wholly immaterial that the
mistake of the circuit court, if mistake it was, occurred at the
time of passing sentence upon the accused, instead of upon the
trial."

That case appears to me quite parallel in principle with
this. There the court declined to review the sentence on
*habeas corpus*, because the court had jurisdiction to pronounce
the sentence in a proper case, and had erred only in misapply-
ing the statute which authorized it. And the court refused
to review the proceeding, or to discharge the prisoner. Here
the statutory jurisdiction of the court to confine this prisoner
by such an order, in a proper case, is conceded; but the
court assumes to review, on *habeas corpus*, the error of the
circuit court in misapplying its power, and to discharge the
prisoner for the misapplication. The two cases are clearly in
conflict.

To the same effect is *Re Perry*, 30 Wis., 268. The language
of Mr. Justice Lyon in the latter case is not so pointed. But
the opinion goes throughout upon the ground that no error of
the commissioner in the exercise of his jurisdiction, once he

In re Ida Louisa Pierce. .(Habeas Corpus.)

had acquired it over the prisoner and the subject matter, could avail the prisoner on a *habeas corpus*.

Mr. Justice COLE repeats the same doctrine in *Re Semler*, *supra*. His opinion concedes that the criminal information on which the prisoner was detained, was insufficient to sustain a conviction; in other words, insufficient to warrant any imprisonment whatever. The opinion concedes that the circuit court was therefore wrong in refusing to quash the information, adding: " But what follows? Manifestly this, that the circuit court gave a wrong decision where it clearly had jurisdiction, in holding a defective information good. The court committed an error, but there is no ground for saying that it acted without jurisdiction in rendering its decision....It is a case of error, for which the petitioner can only have relief on writ of error, or some other appropriate process of review. He cannot have relief on a writ of *habeas corpus*, without making such writ perform all the office of a writ of error. This seems very obvious."

It is inconceivable to me how the doctrine of these cases, apparently conclusive of this, should have been disregarded. But all authority seems to have given way to the exigencies of this case.

Here was, as the opinion concedes, a cause — although in judgment — pending in the circuit court, by force of the continuing power over it. Both of the parties were subject to the jurisdiction of the court over the judgment. One of them willfully violates the judgment, and is brought before the court to answer for the contempt. The opinion concedes the jurisdiction, and the duty of the circuit court to punish the contempt; but holds that it erred in applying a wrong section of the statute to the facts, and that the proceeding was irregular in providing for two things which should have been provided for in separate proceedings. And on these grounds a majority of the court holds that the proceeding was *coram*

*non judice;* null and void, not erroneous and reversible for error.

This confounds jurisdiction and judgment; want of jurisdiction with erroneous judgment. *Bracton* long ago defined jurisdiction to be authority to judge or to declare the law between parties brought into court.[1] This definition has never been bettered, probably never will be, and is of universal authority to this day. Erroneous judgment does not oust jurisdiction. As already seen, jurisdiction of the person and of the subject matter equally supports a judgment, whether it be erroneous or not, if it be a judgment which the court could render on any state of fact. It is upon this principle that appellate courts are established to correct errors. It would be subversive of all security of right resting in judgment, it would lead to disastrous confusion and judicial disorder, if courts could review the judgments of each other collaterally, and disregard their authority by imputing error for want of jurisdiction. If the subject matter of a judicial proceeding be within the jurisdiction of a court entertaining it, and the parties to it be brought or come into the court for judgment, freedom from error is not essential to the validity of the judgment. If the judgment be such as the court had authority to render in the proceeding, in any case, jurisdiction of the cause and parties imports the justice of the judgment while it stands unreversed. This rule I believe to be universal in civilized countries. The inherent fallibility of human tribunals makes it essential to public right and judicial order. Before reversal in a proper appellate court, jurisdiction stands for infallibility.

This view is distinctly affirmed by this court in *Rasmussen v. McCabe*, 43 Wis., 471. "The affidavit on which the gar-

---

[1] *Et nihil aliud est jurisdictio quam habere autoritatem judicandi sive jus dicendi inter partes, de actionibus personarum et rerum, secundum quod deductæ fuerint in judicium per auctoritatem ordinariam vel delegatam, de quibus supra dictum est de potestate judicantium.*   B. 5, c. 1, fol. 400.

nishees were summoned, appears substantially to comply with the statute. The justice's docket shows that they were duly summoned and appeared. Having thus acquired jurisdiction of the subject and of the persons, the justice took with it power, under certain contingencies, to render judgment against them for the value of the chattel; as would be his duty at proper time and in proper circumstances. He may have misconstrued their answers; if so, that was error. He undoubtedly rendered judgment for damages against them improperly. He should first have directed their delivery of the chattel; and, upon their failure to deliver it, have rendered judgment for the value. He appears to have done both in a single judgment, on which execution was issued and the chattel sold. This was undoubtedly error; but it was error, so to speak, which the justice had jurisdiction to commit. The remedy of the garnishees was by appeal. The judgment was erroneous, but not void."

And I can conceive of no judicial mistake more vicious than to confound error in judgment rendered with want of jurisdiction to render judgment. It is a far-reaching judicial heresy, giving every court a *quasi* appellate jurisdiction over every other, and tending to subvert the authority of all courts.

This is the radical error of the judgment in this case. For it holds, not only that this court, in the exercise of its original jurisdiction, but every court and magistrate in the state, having local jurisdiction of the writ of *habeas corpus*, can review such proceedings in the circuit courts, disregard their authority, and discharge their prisoners.

This is judicial disorder and misrule. I say it with profound deference to a judgment sanctioned by all the other members of the court, but I owe it to my place to say it.

For, in issuing the writ of *habeas corpus* under its original jurisdiction, this court takes precisely the same measure of jurisdiction and power over the prisoner, and over the proceeding under which the prisoner is held, that every other

court and every magistrate in the state, having power to issue
the writ, can take. *Re Semler, supra*. And if this court, on
*habeas corpus*, can take authority to review the proceedings of
the circuit court for errors imputed as want of jurisdiction,
so may every court commissioner in the state having local
jurisdiction of the writ. And that is not the limit of this
judicial disorder. Every inferior tribunal and magistrate in
the state, having local jurisdiction of the writ, is likewise li-
censed by the judgment in this case to review a proceeding
for contempt in this court, impute alleged errors in it for want
of jurisdiction, and discharge the prisoner of this court. In
all cases of contempt, this judgment will uphold the review
and defeat of superior authority by inferior. It is sowing the
wind; and not the circuit courts only, but this court also, may
reap the whirlwind.

In *Attorney General v. Railroad Companies, supra*, this
court lately issued a writ of injunction; and in *State v. Doyle*,
*supra*, a writ of *mandamus*. The power of the court to issue
both writs was denied. Had either of those writs been dis-
obeyed, and had this court punished the contempt by impris-
onment, the proper circuit court or judge, or court commis-
sioner, would, according to the doctrine of this case, have
taken jurisdiction, on *habeas corpus*, to review the proceed-
ings here, and to discharge the prisoner of this court for
imputed want of jurisdiction in those cases. At that time, I
cannot doubt that such an interference with the authority of
this court would have been itself held as contempt. But this
court has now sanctioned that license in all courts and officers
having local jurisdiction of the writ. For this reason, I was
anxious that the writ should be rested on the superintending,
rather than on the original, jurisdiction of this court. But
the majority of the court, no doubt inadvertently, preferred
to sow the seed of judicial disorder, which may yet ripen into
a deplorable harvest.

In re Ida Louisa Pierce.   (Habeas Corpus.)

. There are, indeed, cases in some of the reports which may sanction this judgment.   There are, unfortunately, cases to sanction many grave errors.   But the current of respectable authority gives no countenance to any such judicial misrule. As the result of them, I am willing to adopt, for this case, the language of Mr. Hurd: "Although, as will have been observed, there exists considerable conflict in the authorities upon this subject, a careful examination of them, I think, will result in the establishment of the following propositions: The commitment of a person under conviction of contempt is equivalent to a commitment in execution, and the judgment of the court ordering the commitment cannot be inquired into upon *habeas corpus*, except to ascertain whether such court had jurisdiction to punish for contempt.   But if the court making the order be an inferior one, a superior court, in the exercise of appellate or revisory jurisdiction, may, upon *habeas corpus*, review the judgment of such inferior court to ascertain whether the order of commitment was rightfully made." Here the jurisdiction is original, neither appellate nor revisory.   Of cases in conflict with Mr. Hurd's rule, resting on some sentimental glamour of the writ of *habeas corpus*, it may well be said:   *Stat pro ratione voluntas.*

I have endeavored to show that, on this point as well as on the other, the judgment in this case is in conflict with the principles of all the previous decisions of this court on the subject.

And there was nothing in the status of the prisoner to excuse it.   She had had ample time to have sued out her writ of *habeas corpus* before a local court or magistrate, and — if necessary — to have brought it here for review under the appellate jurisdiction of the court.   So she had had ample time to have sued out the proper writ to bring the proceeding of the circuit court, which resulted in her imprisonment, before this court, under its appellate jurisdiction.

In both respects, the case is an innovation without excuse. On both grounds, I am compelled to dissent from the judgment of the court.

*By the Court.* — The demurrer to the return is sustained.