Kenneth G. LLOYD, Plaintiff-Appellee,

v.

Irma LOEFFLER and Alvin F. Loeffler,
Defendants-Appellants.

No. 82–1824.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 5, 1982.

Decided Nov. 30, 1982.

Mark J. Rogers, Milwaukee, Wis., for defendants-appellants.

Carole S. Gailor, Raleigh, N.C., for plaintiff-appellee.

Before PELL, ESCHBACH and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This is an appeal from a judgment in favor of the plaintiff in a diversity suit for tortious interference with the custody of a child. The child, Carol Lloyd, was born in 1978, in Washington, D.C., to Kenneth Lloyd, the plaintiff below and the appellee in this court, and Bonnie Loeffler, now Bonnie McMahan, who was named as a defendant but, for reasons that will appear, is not an appellant. Kenneth and Bonnie have never been married. In 1979 a Maryland state court awarded Kenneth custody of Carol in a contested proceeding but gave visitation rights to Bonnie who by then was married to Earl McMahan, also a defendant below but not an appellant in this court.

On July 20, 1979, the McMahans, ostensibly in the exercise of Bonnie's summer visitation rights, picked up Carol from Kenneth Lloyd's babysitter in Virginia (where Lloyd lived) to take her to Wisconsin to visit Bonnie's parents, the Loefflers, who were defendants below and are the appellants here. The McMahans were to return Carol to her father in Virginia on August 5, but when they arrived at the Loefflers' house they told the Loefflers they would never return the child to her father—and they never have. Apart from brief clandestine visits by the McMahans and Carol to the Loefflers' house in November 1979 and April 1980, the whereabouts of the three of them have been and are unknown. Kenneth Lloyd got a contempt judgment against Bonnie, and arrest warrants, from the Maryland state court that had issued the custody decree, and he has spent thousands of dollars on private detectives to locate the McMahans and Carol, but all to no avail.

In June 1980 Kenneth Lloyd brought this suit in a Wisconsin federal district court against the McMahans and the Loefflers. Lloyd is a citizen of Virginia and the Loefflers citizens of Wisconsin, but the domicile of the McMahans is uncertain; if it is Virginia, the "complete" diversity of citizenship required for jurisdiction under 28 U.S.C. § 1332, see *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), would be lacking. Until their abduction of Carol the McMahans were citizens of Maryland. Lloyd believes they are now living in Wisconsin because the Loefflers have received some correspondence from the McMahans postmarked Milwaukee.

We have found no case involving the question of the domicile for diversity purposes of a fugitive from justice. It seems absurd to hold that since a fugitive might be domiciled anywhere or maybe even nowhere (cf. *Pannill v. Roanoke Times Co.,* 252 Fed. 910, 913–15 (W.D.Va.1918)), the act of becoming a fugitive puts a person beyond the jurisdiction of the federal courts. Probably the last domicile of the fugitive before he fled should be his domicile for diversity purposes. Cf. *Gregg v. Louisiana Power & Light Co.,* 626 F.2d 1315 (5th Cir.1980). That would be Maryland in this case, and would not destroy diversity. This is a simple rule, and avoids rewarding the fugitive for his elusiveness. But in any event the probability that the McMahans were citizens of Virginia when this suit was filed is too slight to make us worry that there may not in fact be complete diversity.

After a bench trial, the district court, 539 F.Supp. 998, found that the McMahans and the Loefflers had committed a tort under the common law of Wisconsin by interfering with Kenneth Lloyd's custody of Carol. The Loefflers' liability was based on conspiracy. Aware at all times of the custody decree and of the fact that the McMahans were in contempt of it, the Loefflers helped the McMahans conceal the child's whereabouts from Kenneth. Among other things they let the McMahans give the Loefflers' address to the federal government, which owed the McMahans (former federal employees) refunds of their retirement contributions; and when the money arrived the Loefflers forwarded it to the McMahans without revealing the McMahans' whereabouts to Kenneth. The Loefflers testified that they tried to persuade the McMahans to return the child to Kenneth, but the district court found their testimony unconvincing and instead credited testimony that Mrs. Loeffler had told a detective: "just tell that son-of-a-bitch that he will never see that child again." Mrs. Loeffler admitted that she thought Kenneth "physically incapable of taking care of this child."

The district court awarded Kenneth $70,000 in compensatory damages for which all the defendants were to be jointly and severally liable and $25,000 in punitive damages for which the McMahans alone were to be liable because of their greater culpability. The judgment provides that the award of punitive damages is to grow by $2,000 every month until Carol is returned to her father's lawful custody. The McMahans entered no appearance in the district court or this court.

Before reaching the merits we must decide whether this suit is within the exception to the diversity jurisdiction for domestic relations matters, including disputes over who should have custody of a child. Recently two circuits have held that tort suits for interference with custody are not within the exception. See *Wasserman v. Wasserman,* 671 F.2d 832 (4th Cir.1982); *Bennett v. Bennett,* 682 F.2d 1039 (D.C.Cir. 1982). A third has upheld a damage award in such a case without discussing jurisdic-

tion. See *Fenslage v. Daukins,* 629 F.2d 1107 (5th Cir.1980). But it is a question of first impression in this circuit, though *Daily v. Parker,* 152 F.2d 174 (7th Cir.1945), could be likened to *Fenslage.* The short but perhaps incomplete answer to the question is that such cases do not involve an actual dispute over custody. The McMahans have not challenged the decree of the Maryland court awarding custody of Carol to Kenneth Lloyd; they have defied it. This answer would be conclusive if the McMahans and the Loefflers were strangers who had kidnapped Carol. But because Bonnie McMahan is Carol's mother and the Loefflers her maternal grandparents the abduction is in a sense a continuation of the custody fight that the Maryland court thought it had resolved when it awarded custody to Kenneth and visitation rights to Bonnie. Cf. 18 U.S.C. § 1201(a) (the exception in the federal kidnapping statute for the kidnapping of a minor by a parent).

The usual account of the domestic relations exception, as of the probate exception discussed recently in *Dragan v. Miller,* 679 F.2d 712 (7th Cir.1982), is a historical one. The first judiciary act gave the federal courts diversity jurisdiction of "all suits of a civil nature at common law or in equity," Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 78 (simplified in the present diversity statute, but without change of meaning, see Reviser's Note to 28 U.S.C. § 1332 (1976), to "all civil actions," 28 U.S.C. § 1332(a)); and divorce, custody, and related matters were in England the province of the ecclesiastical courts (on which see 3 Blackstone, Commentaries on the Laws of England 87–103 (1768)) rather than of the common law and equity courts. The historical account is unconvincing. See *Spindel v. Spindel,* 283 F.Supp. 797, 802–03, 806–09 (E.D.N.Y.1968). It exaggerates the nicety with which the jurisdictional distinctions among the English courts were observed. Applied to this case, it overlooks the extensive custody jurisdiction of the Court of Wards and Liveries, a royal court distinct from the ecclesiastical courts. See Bell, An Introduction to the History and Records of the Court of

Wards & Liveries 112–32 (1953). And it assumes without discussion that the proper referent is English rather than American practice, though if only because there was no ecclesiastical court in America American law and equity courts had a broader jurisdiction in family-law matters than their English counterparts had. Probably the reference to law and equity in the first judiciary act is mainly to English practice rather than to the diverse judicial systems of the colonies and states; but it would be odd if the jurisdiction of England's ecclesiastical courts, theocratic institutions unlikely to be well regarded in America, should have been thought to define the limits of the jurisdiction of the new federal courts.

The historical account would be of little assistance in this case even if it were sound. The tort of wrongful interference with a child's custody did not exist at the time the first judiciary act was passed, and it would strain our historical imagination to the breaking point to try to determine whether, had there been such a tort then in England, it would have been within the exclusive jurisdiction of the ecclesiastical courts.

However dubious and unhelpful its historical pedigree, the domestic relations exception is too well established to be questioned any longer by a lower court. See e.g., *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel,* 490 F.2d 509, 512–14 (2d Cir.1973); *Solomon v. Solomon,* 516 F.2d 1018, 1021–26 (3d Cir.1975). This is so even though one might question, see *Dragan, supra,* 679 F.2d at 713, the suggestion in *Rosenstiel, supra,* 490 F.2d at 514, that a century of congressional silence constitutes legislative adoption of what was originally, and maybe still is today, a purely judge-made exception to the diversity jurisdiction. The boundaries of the exception are uncertain, however; and to fix them we must consider what contemporary function the exception might be thought to serve.

At its core are certain types of cases, well illustrated by divorce, that the federal courts are not, as a matter of fact, competent tribunals to handle. The typical divorce decree provides for alimony payable in installments until the wife remarries, and if there are children it will provide for custody, visitation rights, and child support payments as well. These remedies—alimony, custody, visitation, and child support—often entail continuing judicial supervision of a volatile family situation. The federal courts are not well suited to this task. They are not local institutions, they do not have staffs of social workers, and there is too little commonality between family law adjudication and the normal responsibilities of federal judges to give them the experience they would need to be able to resolve domestic disputes with skill and sensitivity.

■ The present case, a tort suit that does not—not overtly anyway—seek one of the distinctive remedies provided by family courts, is not within the core of the domestic relations exception as we have described it. But there is also a periphery to be considered. When a case must begin in state court, as a divorce or custody case must, retention of any ancillary litigation in the same court is supported by considerations of judicial economy, and also by considerations of relative expertness since the issues in an ancillary proceeding may be the same as those in cases that are within the core of the domestic relations exception and hence within the exclusive jurisdiction of the state courts. Cf. *Dragan, supra,* 679 F.2d at 714–15. In this vein Judge Friendly suggested in *Rosenstiel* that if the plaintiff had been seeking attorney's fees for work performed in connection with his client's divorce action the federal court should have declined jurisdiction. See 490 F.2d at 515.

The concept of ancillarity may explain decisions which hold that actions to enforce an alimony or custody decree are outside the diversity jurisdiction if the decree remains subject to modification by the court that entered it, see *Morris v. Morris,* 273 F.2d 678, 681–82 (7th Cir.1960); *Hernstadt v. Hernstadt,* 373 F.2d 316 (2d Cir.1967); *Sutter v. Pitts,* 639 F.2d 842 (1st Cir.1981), though it is true that in such cases the risk of inconsistent state and federal decrees is substantial and presents an even stronger reason than judicial economy for federal

abstention. At the other extreme is *Crouch v. Crouch,* 566 F.2d 486 (5th Cir.1978), where the federal court was asked simply to enforce the monetary provisions of a separation agreement between persons long divorced. There the connection with the original matrimonial action was tenuous, the danger of inconsistent decrees trivial. Alimony decrees that have become final are sometimes enforced in diversity cases on similar grounds. See 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3609 at pp. 673–74 (1975). But *Rosenstiel* suggests, sensibly in our view, that the question is not only whether the exercise of federal jurisdiction will create a potential for inconsistent decrees but also whether it will result in piecemeal, duplicative, or inexpert handling of what is substantially a single controversy.

■ On this analysis, if under Maryland law a tort action arising out of a custody decree had to be tried in a proceeding ancillary to the custody proceeding, this would be a strong argument against federal jurisdiction. Cf. *Dragan, supra,* 679 F.2d at 716. But though we have found no Maryland case dealing with the tort of wrongful interference with custody, it is clear that such a case if it arose would be litigated as an independent civil action and not as an appendix to the custody proceeding, which is strictly equitable. See Md.Code § 3–602(a), as interpreted in *Kapneck v. Kapneck,* 31 Md.App. 410, 356 A.2d 572 (1976). In addition, of course, a Maryland court might not be able to obtain personal jurisdiction over the Loefflers, even though the new federal Parental Kidnapping Prevention Act of 1980, codified in 18 U.S.C. § 1073, 28 U.S.C. § 1738A, and 42 U.S.C. § 663, makes it easier for states to enforce their state custody decrees against parental abductors who cross state lines. Incidentally, by declining to create federal judicial remedies for parental abductions, the Act confirms the primacy of the states in custody matters. But it cannot we think be read to express a federal policy against the exercise of federal jurisdiction in a case such as this if the ordinary requirements of diversity jurisdiction are satisfied.

There is thus no issue of judicial economy here. The choice is not between one Maryland action and two actions—the custody action in Maryland and a tort action in a state or federal court in Wisconsin—but between a tort action in a Wisconsin state court and this suit in a federal district court in Wisconsin. And since the Loefflers do not contest the validity of the Maryland custody decree, the tort issues in this case are not entangled with issues that only state courts are competent to resolve. The federal court is being asked to decide not who should have custody over Carol but only whether the McMahans and the Loefflers have violated or (in the case of the Loefflers) conspired to violate the custody decree by taking Carol away from her father, and if so what damages he has suffered. The resolution of these issues requires no special experience with the business of domestic relations courts; the requisite empathy, if any is required, is possessed by any parent. Finally, this is not a case like *Rosenstiel* where the plaintiff's invocation of the diversity jurisdiction has no basis in the concern with prejudice to out-of-state litigants that underlies that jurisdiction. The plaintiff is not a resident of Wisconsin, where the case was tried; the Loefflers, the only appearing defendants, are Wisconsin residents.

One feature of the decree, though, raises a serious question under the domestic relations exception: the provision that makes the award of punitive damages against the McMahans grow by $2,000 a month until they restore Carol to Kenneth Lloyd's lawful custody. That provision may not, strictly speaking, be before us since the only people who could complain about it, the McMahans, are not before us. But to pass over it in silence might leave the impression that there are no problems with the district court's jurisdiction to issue such a decree, and there are; and as they may affect a child's welfare we shall discuss them.

In a case of a continuing tort a variable award of punitive damages, though unprecedented so far as we are able to determine

and seemingly not contemplated by the Federal Rules of Civil Procedure, see Rule 58, is perfectly logical; the enormity of the wrong that the McMahans have committed against Kenneth Lloyd grows with every day that they fail to return Carol to his custody. But the variable award is also the practical equivalent of an injunction ordering the McMahans to return Carol. It is as if the district court had issued an injunction, the McMahans had disobeyed it, and the court had then found them in civil contempt of its decree and ordered them to pay the plaintiff $2,000 a month until they complied. Of course there was no injunction and no finding of contempt and perhaps that is reason enough to doubt the propriety of the relief. But in any event it would seem that, before entering the kind of judgment it did, the district court should have considered whether it had the power to enjoin the McMahans directly.

An affirmative answer would produce a collision with the recent decision of the District of Columbia Circuit in *Bennett v. Bennett, supra.* The court allowed the plaintiff in a tortious interference with custody suit to obtain damages but held that the grant of an injunction directing that the child be returned to the plaintiff was barred by the domestic relations exception to the diversity jurisdiction. The court was concerned that enforcing such an injunction would be the equivalent of issuing a custody decree. The basis of its concern is illustrated by the facts of the present case. It is three years since Carol was abducted. She is now four and a half years old. She probably does not remember her father. No matter how egregiously the McMahans have behaved, it might be a terrible thing today to wrench Carol from their custody and return her to her father—and all the more terrible at some hypothetical future date when the McMahans, finally intimidated by the mounting costs of their contumacy, as the district court intended they be intimidated, surrender Carol. The district court can try to compensate Kenneth Lloyd for his loss. But to put pressure on the McMahans to return the child, by means of an escalating damage award bearing no

necessary relationship to Kenneth's loss, is implicitly to answer the question who should have custody of Carol today. True, the escalating damage award is contingent on Kenneth's retaining lawful custody of Carol, so it is open to the McMahans to go back to the Maryland court and ask for a modification of the decree in light of changed circumstances—the growing attachment, as we may assume, of Carol to her mother and her mother's husband. But this would be a costly option for the McMahans to pursue; every month that passed while the Maryland court was deciding whether to modify the decree would cost them another $2,000.

Against all this it may be said that so long as Kenneth is free to bring fresh suits against the Loefflers and the McMahans for damages incurred by him after the date of the judgment below, the same financial pressure will be brought to bear on the McMahans to return the child regardless of what is best for her. But it will not be quite the same. We do not know whether Kenneth will bring another suit, or if he does whether he will be able to prove substantial damages beyond what he has already incurred. If there is another suit, we do not know whether the McMahans will again be joined as defendants along with the Loefflers, and if they are whether Kenneth will try to collect any part of the judgment from the McMahans, assuming that they and the Loefflers are held to be jointly and severally liable for that judgment as they were for the compensatory damages awarded in this case. So there is a difference, and though it is one of degree rather than of kind it is sufficient in our judgment to raise a substantial question whether the escalating punitive damage award in the district court's decree was within the court's subject-matter jurisdiction. As no party to this appeal is challenging this portion of the decree we doubt that we have the power to vacate it, but we should not like our affirmance of the judgment to be interpreted as approval of the decree in its entirety.

Still another threshold issue in this case is choice of law. The court below held that the applicable substantive law was that of Wisconsin. The only basis it gave for this conclusion was a citation to *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). But *Erie* did not hold, as the district court's citation may seem to imply, that in common law diversity cases the substantive law to be applied is that of the state in which the case is tried. On the contrary, *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), deduced from *Erie* that the proper choice of law rule to apply in a diversity suit is the rule of the forum state. The district court should have determined whether under Wisconsin conflict of laws principles the substantive law applicable to this case is that of Wisconsin or that of some other state, such as Maryland where the custody decree was issued, or Virginia where Lloyd resides and where the tort might be said to have occurred if the McMahans formed the intent not to return Carol before they picked her up from the babysitter. There is no indication that the district court made such a determination.

In a supplementary brief the Loefflers argue that Maryland rather than Wisconsin substantive law should be applied under Wisconsin's choice of law rules. But they did not raise this issue in their main brief or even, it appears, in the district court. At the oral argument of this appeal both counsel stated that the parties had stipulated in the district court that Wisconsin substantive law applied to the case, and though we do not find a written stipulation in the record we cannot see what difference it makes whether it is written or oral. So there is no conflict of laws issue before us unless the issue goes to our subject-matter jurisdiction.

We hesitate to say that a conflicts question never can affect jurisdiction. If the parties had stipulated that the substantive law to be applied was the Code of Hammurabi, we think the district court should have said that it did not have the power to render a decision on that basis. Such a decision could not have any value as precedent, and the production of precedents is a major function of judicial decision-making. Stipulations of law, as distinct from fact, thwart that function; maybe that is why they have no binding force. See, e.g., *Sanford's Estate v. Commissioner of Internal Revenue,* 308 U.S. 39, 51, 60 S.Ct. 51, 59, 84 L.Ed. 20 (1939). But reasonable stipulations of choice of law are honored in contract cases, see Weintraub, Commentary on the Conflict of Laws 355–56 (2d ed. 1980), and we do not see why the same principle should not apply in tort cases, though the issue has not to our knowledge arisen in such a case. There is no necessary inconsistency between this principle and cases like *Sanford's Estate.* A court has an interest as we have said in applying a body of law that is in force somewhere, but less interest in which such body of law to apply.

The stipulation of Wisconsin law was reasonable here—indeed, if the parties, rather than so stipulating, had not raised any choice of law issue, and had litigated the case under Wisconsin law, that would have been proper. An implicit rule of Wisconsin conflicts law is that in the absence of objection the substantive law to be applied to a suit tried in a Wisconsin state court is that of Wisconsin. *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 941 (7th Cir.1982); cf. *Electronic Associates, Inc. v. Automatic Equipment Development Corp.,* 440 A.2d 249, 251 n. 3 (Conn.1981). *Klaxon* makes this rule equally applicable to suits brought in federal court in Wisconsin under the diversity jurisdiction. *Central Soya Co., supra,* 676 F.2d at 941.

We arrive finally at the merits, where the principal issue is whether Wisconsin recognizes the tort of wrongful interference with a child's custody—more precisely, whether it would recognize it if the question arose in a Wisconsin state court case, as it has not yet done. The appellants pitch their whole case that Wisconsin would not recognize such a tort on *In re Pierce,* 44 Wis. 411 (1878). Pierce had been divorced from her husband, and custody of their child had been awarded to him. She abducted the

child, was imprisoned for contempt of the decree, and petitioned for habeas corpus. The court believed that she could not properly be adjudged in contempt unless her conduct had caused "a loss or injury which would entitle the injured party [her husband] to maintain an action against the offender to recover damages for his misconduct," *id.* at 424, and the court thought her husband could not maintain such an action because a father's status under a divorce and custody decree "is not that of father and child, nor yet that of master and servant. It is more nearly like that of guardian of the person and ward. In that relation the guardian is not entitled to the services of the ward." *Id.* at 425. Portions of *In re Pierce* have been overruled, see *Emerson v. Huss,* 127 Wis. 215, 226, 106 N.W. 518, 522 (1906); *Larson v. State ex rel. Bennett,* 221 Wis. 188, 194, 266 N.W. 170, 173 (1936), but not the analysis of the father's right to maintain a damage action for the abduction of a child.

Nevertheless, we are pretty confident it would not be followed today. The analysis assumes that a parent can complain about a child's being disabled (or what amounts to the same thing, abducted) only if the parent has lost money in the quite literal sense that the child's earnings, which at common law belong to the parents during the child's minority, are impaired. That was the common law rule when *In re Pierce* was decided. See, e.g., *Callies v. Reliance Laundry Co.,* 188 Wis. 376, 380, 206 N.W. 198, 200 (1925). Since a father who had custody under a divorce decree had no right to the child's earnings—unlike a married parent but like a guardian—he had no basis for maintaining a damage action against the abductor. This is the entire premise of *In re Pierce* so far as is relevant to this case and it was destroyed in 1975 when the Supreme Court of Wisconsin, in *Shockley v. Prier,* 66 Wis.2d 394, 225 N.W.2d 495 (1975), overruled *Callies* and held that parents are entitled to recover damages for loss of the companionship of a minor child who has been injured by someone's negligence. The fact that as in *Pierce* there is no pecuniary loss is now irrelevant under Wisconsin law.

■ *Pierce* is therefore no obstacle to Wisconsin's recognizing a tort of wrongful interference with a child's custody; and *Shockley* fairly requires such recognition, for it can make no logical or practical difference, so far as a parent's action for loss of companionship is concerned, whether the child is physically injured by a third party's negligence or abducted by the third party. At least this is clear where the abductor is a stranger rather than, as is more common, a relative. Although these two cases are not identical, those states that recognize a tort of wrongful interference with custody make no distinction based on the relationship between the abductor and the child, provided of course that the abductor does not have lawful custody of the child. See, e.g., *McBride v. Magnuson,* 282 Or. 433, 578 P.2d 1259 (1978); *Kipper v. Vokolek,* 546 S.W.2d 521 (Mo.App.1977); Restatement of Torts (Second) § 700 (1981). As no other state has made such a distinction we think it unlikely that Wisconsin would. The only question therefore is whether it would draw the line at physical injury and refuse to recognize any tort liability for abduction even though the effect on the parent's interest in the companionship of the child is the same. This would be an arbitrary distinction, and we doubt very much that Wisconsin would make it. We know of no state that, having swallowed the camel of allowing parents to sue for intangible loss of companionship as well as pecuniary loss, has strained at the gnat of allowing that loss to be recovered when it is caused by abduction rather than by physical injury. Moreover, since abductions are always deliberate and physical injuries usually, as in *Shockley,* merely negligent, it would be anomalous to allow liability only in the latter case. Consistently with this distinction, California allows it only in the former. See *Baxter v. Superior Ct. of Los Angeles Cty.,* 19 Cal.3d 461, 466 and n. 3, 138 Cal.Rptr. 315, 318 and n. 3, 563 P.2d 871, 874 and n. 3 (1977).

■ The Loefflers argue, finally, that even if Wisconsin would recognize a tort of wrongful interference with a child's custo-

dy, their role in the abduction by the McMahans was too small to make them guilty of conspiracy. This argument raises only an evidentiary issue, which the district court resolved against them, and we cannot say that its finding was clearly erroneous. Without the active cooperation of the Loefflers the McMahans would have found it much more expensive to conceal Carol's whereabouts, as the McMahans would have been afraid to give their address to any creditor lest Kenneth Lloyd's detectives get hold of it and track them down. The Loefflers, fully aware of, and we may infer from the "son of a bitch" remark sharing, the McMahans' purpose of concealing Carol, provided them with a discreet mail drop and other assistance.

It is true, as we observed in a recent case, that conspiracy has a somewhat anomalous status under tort law, since a tort, to be actionable, requires that an injury actually be suffered, while conspiracies are no less unlawful for being nipped in the bud. See Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 453 (7th Cir.1982). But that observation has no relevance where the conspiracy achieves its object, as it did here. The purpose of the conspiracy concept in such a case is not to punish merely preparatory conduct—a more suitable function for criminal law than for tort law—but to identify the tortfeasors. By helping the McMahans conceal Carol the Loefflers became joint tortfeasors in the original sense of the term. See, e.g., Brown v. Brown, 338 Mich. 492, 503–04, 61 N.W.2d 656, 661–62 (1953); Prosser, Handbook of the Law of Torts 291 (4th ed. 1971).

AFFIRMED.