# United States Court of Appeals
## For the First Circuit
<u></u>

No. 12-1427

COLIN BOWER, on his own behalf and as the guardian
and legal custodian of his minor children, N and R,

Plaintiff, Appellant,

v.

EGYPTAIR AIRLINES COMPANY,

Defendant, Appellee,

MIRVAT EL-NADY BOWER,

Defendant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, <u>U.S. District Judge</u>]

———————————

Before

Lynch, <u>Chief Judge</u>,
Torruella, <u>Circuit Judge</u>,
and DiClerico,[*] <u>District Judge</u>.

———————————

Joshua L. Solomon, with whom Barry S. Pollack, Sullivan & Worcester LLP, Howard M. Cooper, Julie E. Green and Todd & Weld LLP, was on brief for appellant.
Christopher Carlsen, with whom Deborah Anne Elsasser, Clyde & Co US LLP, Brian Paul Voke and Campbell Campbell Edwards & Conroy, P.C., was on brief for appellee.
Judith R. Nemsick, with whom Holland & Knight LLP and Michael T. Maroney, was on brief for Amici Curiae International Air Transport Association and Air Transport Association of America, Inc.

———————————

[*] Of the District of New Hampshire, sitting by designation.

October 2, 2013

**TORRUELLA, Circuit Judge.** This appeal stems from an international parental kidnapping perpetrated by defendant Mirvat El-Nady. Plaintiff-appellant in this case, Colin Bower, is El-Nady's former husband. In August 2009, El-Nady acted in violation of a court order when she drove the former couple's two minor children to New York City, where they boarded an EgyptAir Airlines Company ("EgyptAir") flight to Cairo, Egypt. This prompted Bower, on his own behalf and on behalf of his two minor children, to initiate this lawsuit against El-Nady and EgyptAir. Bower claims that the airline interfered with his custodial relations and was negligent in allowing El-Nady to board the flight despite the alleged presence of "red flags" suggesting that she was abducting the two children. The district court granted EgyptAir's motion for summary judgment and dismissed Bower's claims, finding that EgyptAir did not know of El-Nady's plan to abduct the children and did not owe either Bower or the children a duty to investigate the "red flags." Bower now appeals from that determination, arguing, among other things, that the district court erred in determining that it had subject matter jurisdiction. We find that the district court had jurisdiction over the claims and affirm their dismissal, albeit on the grounds that the claims are preempted under the Airline Deregulation Act, 49 U.S.C. § 41713 ("ADA").

# I. Background

## A. Factual Background

Mirvat El-Nady, an Egyptian citizen, and Colin Bower, a United States citizen, met in Cairo, Egypt and married in 1998. Subsequently, they moved to London where they had two children, whom the parties refer to as "N" and "R."[1]  In 2005, the family moved to Massachusetts, but the relationship between Bower and El-Nady eventually soured, and they divorced in Massachusetts on December 1, 2008.  Pursuant to the divorce decree, Bower was given sole legal custody of the children, but he shared physical custody with El-Nady.  The decree also prohibited El-Nady from taking the children out of Massachusetts.

On or about August 7, 2009, Bower dropped off the children at El-Nady's home in Massachusetts for a court-ordered visit.  On August 11, 2009,  El-Nady drove the two children to John F. Kennedy International Airport ("JFK") in New York.  Once there, she purchased three one-way business-class tickets to Cairo, Egypt, for which she paid almost $10,000 in cash.  El-Nady and her children presented Egyptian passports for travel.  EgyptAir did not recognize that the children's passports had no entry visas reflecting the children's arrival in the United States.  Moreover,

---

[1]  The district court found that the children were dual citizens of the United States and the United Kingdom, and that they were eligible to become citizens of Egypt.

EgyptAir did not comment on the fact that El-Nady and her children had different last names,[2] nor did it check for their I-94 forms.[3]

Following their flight, El-Nady and the children remained in Cairo, Egypt with no intention of returning to the United States.  El-Nady had previously worked in Egypt and currently has family there.  In December 2009, approximately four months after moving to Egypt, El-Nady obtained an order from a court in Cairo granting her custody of the two children.  Shortly thereafter, Bower retained counsel in Cairo and appealed the custody order.[4]  The Cairo court granted Bower's motion seeking visitation rights, and he was able to visit the children at least four times in Cairo, under the supervision of El-Nady and members of her family.

---

[2]  Per Egyptian naming customs, El-Nady retained her maiden name after marrying while her children took their father's surname.

[3]  The I-94 Form is an arrival/departure record issued by a Customs and Border Protection ("CBP") officer to foreign visitors entering the United States.  The officer generally attaches the I-94 Form to the visitor's passport when the visitor enters the United States. As a general rule, when the visitor exits the United States via commercial aircraft, he or she must fill out the departure portion of the Form and provide it to the airline, which in turn provides it to the CBP officer at the port of departure.  See 8 C.F.R. § 231.2(b)(1).  However, United States citizens do not require I-94 Forms.  See 8 C.F.R. § 231.2(b)(2) ("The form I-94 requirement . . . does not apply to United States citizens. . . .").

[4]  While the record is murky as to the outcome of Bower's appeal, and neither party briefed the issue, it appears that Bower was ultimately successful and that on November 24, 2010, the court in Cairo set aside and nullified its prior order granting El-Nady custody. See App. 1103-09 (translating the Arabic order).

-5-

## B. Procedural History

On February 5, 2010, Bower filed this action in Massachusetts Superior Court on his behalf and on behalf of his children in his capacity as guardian of "N" and "R." As defendants, he listed both El-Nady[5] and EgyptAir. His complaint asserted that EgyptAir intentionally interfered with his custodial relations and was negligent in allowing El-Nady and the children passage to Egypt despite the presence of numerous "red flags" that suggested a child abduction was in progress. He also alleged that he has incurred significant economic damages in attempting to locate and recover his children since they were abducted by his former spouse, and that he has suffered trauma and emotional distress with physical manifestations, as well as loss of filial consortium, due to the absence of his children.

On March 8, 2010, EgyptAir removed the case to federal district court on diversity grounds or, alternatively, on the grounds that the claims were preempted by an international treaty known as the Montreal Convention.[6] Following removal, Bower filed a motion seeking a ruling to resolve the issue of whether the court

---

[5] Bower's claims against El-Nady included interference with custodial relations, false imprisonment, negligent infliction of emotional distress, intentional infliction of emotional distress, and loss of filial consortium.

[6] Convention on the Unification of Certain Rules of International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 309 (entered into force Nov. 4, 2003) [hereinafter Montreal Convention].

possessed subject matter jurisdiction. The district court determined that there was diversity jurisdiction, finding that both El-Nady and EgyptAir were citizens of Egypt at the time the litigation commenced.

On March 21, 2012, the district court granted EgyptAir's motion for summary judgment and dismissed all of Bower's claims against EgyptAir. As a threshold matter, the district court rejected EgyptAir's argument that the claims against it were preempted by the ADA and the Montreal Convention. As to the merits, the district court found that EgyptAir had no actual knowledge that El-Nady in fact planned to kidnap the children, thus dooming Bower's interference with custodial relations claim. As to the negligence claims, the court concluded that EgyptAir owed no duty of care, either to Bower or the children, to investigate whether El-Nady was traveling with them in violation of a court order.

Following the district court's ruling on the motion for summary judgment, Bower filed this timely appeal.[7]

## II. Discussion

We begin our discussion by explaining why the district court possessed subject matter jurisdiction over this case. We then proceed to the matter of preemption under the ADA.

---

[7] The district court entered a default judgment against El-Nady on October 26, 2012.

## A. Subject Matter Jurisdiction

Bower's first argument on appeal is that the district court erred when it found that the parties had complete diversity of citizenship. Specifically, Bower claims that El-Nady is a "fugitive from justice" under 18 U.S.C. § 1073, since she fled the United States to avoid prosecution for kidnapping his children. Because she is a fugitive, he argues, the district court should have found that her domicile was her last known pre-flight residence in Massachusetts. Such a finding would, Bower argues, properly divest the court of subject matter jurisdiction.

We review the district court's conclusion that it had subject matter jurisdiction over the complaint de novo. Fernández-Vargas v. Pfizer, 522 F.3d 55, 63 (1st Cir. 2008). For the following reasons, we disagree with Bower's jurisdiction argument and find that the district court correctly concluded that El-Nady's domicile for diversity purposes is Egypt.

The law is well established that an adult person acquires a legal "domicile" when he or she is physically present in a location and has the intent to remain there for the indefinite future. Hall v. Curran, 599 F.3d 70, 72 (1st Cir. 2010); see García-Pérez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004); Rodríguez-Díaz v. Sierra-Martínez, 853 F.2d 1027, 1029 (1st Cir. 1988) (ascertaining an individual's domicile requires two showings: (1) physical presence in a state; and (2) the intent to make such

a state the individual's home).  El-Nady, by virtue of her presence in Egypt and her demonstrated intent to remain there, acquired a legal domicile in Egypt.  Her status as a fugitive does not prevent such a finding where the "presence plus intent" rule is satisfied.  See Stifel v. Hopkins, 477 F.2d 1116, 1123 (6th Cir. 1973) ("Refugees or fugitives, who leave their homes because of . . . apprehension of prosecution can establish domiciles within the jurisdictions in which they seek asylum."); Popal v. Slovis, No. 12 Civ. 3916, 2013 WL 1234875 (S.D.N.Y. Mar. 27, 2013) (finding that alleged murderer fleeing to California to evade a police investigation could establish a domicile in California).

It is only when these presence and intent requirements cannot be met, such as when a fugitive's current whereabouts are unknown, that the fugitive's last domicile before fleeing "should be his domicile for diversity purposes."  See Lloyd v. Loeffler, 694 F.2d 489, 490 (7th Cir. 1982).  As Judge Posner explained:

> It seems absurd to hold that since a fugitive might be domiciled anywhere or maybe even nowhere the act of becoming a fugitive puts a person beyond the jurisdiction of the federal courts. Probably the last domicile of the fugitive before he fled should be his domicile for diversity purposes. . . . This is a simple rule, and avoids rewarding the fugitive for his elusiveness.

Id. at 490 (internal citation omitted).  Where an alleged fugitive has established both physical presence and intent to remain indefinitely at a known location, however, the logic of Lloyd does

not sound with equal force.  Cf. Ríos v. Civiletti, 571 F. Supp. 218, 223 (D.P.R. 1983) (considering an army deserter, the court stated, "the total circumstances of his desertion must be examined to know if his stay, however long, in Mexico worked to effect a change of his domicile").  Under such circumstances, the fugitive has, through compliance with the "presence plus intent" rule, established a new domicile in the state where she or he is hiding. See United States v. Otherson, 480 F. Supp. 1369, 1371 n.4 (S.D. Cal. 1979) ("[A] fugitive from justice can establish a legal 'domicile' where he is hiding.").

It is undisputed that El-Nady, in August of 2009, fled the United States and took her children to Cairo, Egypt, where she had previously worked and currently has family.  While there, El-Nady initiated a custody battle in Egyptian courts for her children.  Indeed, as asserted in Bower's complaint, El-Nady intends to remain in Egypt with the children permanently.[8] El-Nady's relocation and her intent to remain in Egypt satisfy the requirements of the "presence plus intent" rule.  See Padilla-Manqual v. Pavía Hosp., 516 F.3d 29, 31-32 (1st Cir. 2008); Sullivan v. Town of Ashfield, 227 Mass. 24, 26, 116 N.E. 565, 566 (1917) ("A domicile once acquired is presumed to continue until a new one is acquired by actual change of residence with the

---

[8]   In his Amended Complaint, Bower states that "on or about August 11, 2009, [El-Nady] established a new domicile for herself in Egypt."

intention of remaining permanently at the place of removal."). As such, at the time the suit was brought, El-Nady was domiciled in Egypt, and Lloyd's "pre-flight domicile" rule is wholly inapplicable.

Bower disagrees with this assessment and instead argues that Lloyd is directly applicable to the facts of this case. In Lloyd, he claims, the whereabouts of the fugitive defendants were also known, given that the fugitives had sent several pieces of correspondence postmarked from Milwaukee, Wisconsin to their family members. We disagree. The mere existence of postmarked correspondence, on its own, fails to show that the fugitive defendants intended to remain in Wisconsin indefinitely. See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989) (stating that domicile "is not necessarily synonymous with 'residence'"). In fact, the Seventh Circuit noted that the plaintiff had spent "thousands of dollars on private detectives" to locate the fugitive defendants and his kidnapped daughter, to no avail. Lloyd, 694 F.2d at 490. In contrast, the undisputed evidence here shows that El-Nady fled to Egypt with the intent to remain there indefinitely and that Bower had no trouble finding her, as evinced by his appeal of the Egyptian court's custody order and his multiple visits with his children under El-Nady's supervision. Therefore, the holding in Lloyd is inapposite to the facts of this case.

-11-

Next, Bower claims that if El-Nady qualifies as an Egyptian domiciliary, so do the children "N" and "R," who were living with her at the time this suit was filed. Because the children are plaintiffs in this case, he claims, there is not complete diversity given that the defendants, EgyptAir and El-Nady, are also Egyptian domiciliaries. Although the district court did not make a finding as to this issue, we conclude that the children remain domiciled in Massachusetts.

We rely on federal common law when determining a litigant's domicile for diversity purposes. Rodríguez-Díaz, 853 F.2d at 1030, 1033. Typically, "relevant rules of state law provide the basis for the applicable federal common law." Id. at 1033. In Massachusetts, the domicile of a child is the same as the domicile of the parent who has lawful custody of the child. Durfee v. Durfee, 293 Mass. 472, 478 (1936) (emphasis added); see also Gil v. Servizio, 375 Mass. 186, 189 (1978) ("The domicile of the . . . children [is] the same as the domicile of their parent who has lawful custody of them."). Accordingly, a parent without lawful custody has "no power to change the domicile of his child while . . . subject to a valid decree giving custody to the" other parent. Conley v. Conley, 324 Mass. 530, 534 (1949) (holding that the domicile of the child follows that of the parent with lawful

-12-

custody).  Bower was awarded sole legal custody of his children.[9]

Since a child's domicile follows that of the parent with lawful

custody, and El-Nady has no power to change the domicile of her

children while they are subject to a valid custody order, the

domicile of the children is Massachusetts.  See Conley, 324 Mass.

at 534.

Thus, there exists complete diversity of citizenship

between the parties such that the federal courts have subject

matter jurisdiction to hear this case.

**B.  Preemption Under the ADA**

Bower's second claim of error on appeal is that the

district court erred in awarding summary judgment to EgyptAir.

Specifically, Bower takes issue with the court's findings that the

airline had no actual knowledge that El-Nady was traveling with the

children in violation of a court order and was under no duty to

investigate that fact.  For the reasons that follow, however, we

conclude that Bower's common law tort claims against EgyptAir are

preempted by the ADA.

We review the district court's granting of summary

judgment de novo, drawing all reasonable inferences in favor of the

non-moving party.  Rockwood v. SKF USA, Inc., 687 F.3d 1, 9 (1st

_____

[9]  Bower relies heavily on the validity of this Massachusetts
custody order to argue that El-Nady deprived him of his custody
rights.  He cannot, therefore, suggest that the order is invalid or
should otherwise be ignored by this court for diversity purposes
without undermining his claim on the merits.

Cir. 2012).  We may affirm on any independently sufficient grounds made manifest by the record.[10]  Id.  Federal preemption issues are questions of statutory construction that we review de novo. DiFiore v. American Airlines, Inc., 646 F.3d 81, 85 (1st Cir. 2011).

To determine whether plaintiff's common law tort claims are preempted by the ADA, 49 U.S.C. § 41713(b)(1), we begin by noting that the Supremacy Clause nullifies state laws that "interfere with, or are contrary to" federal laws enacted by Congress.  Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 210-11 (1824). Federal preemption may be either express or implied, and where express, the starting point for our analysis is the "language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." FMC Corp. v. Holliday, 498 U.S. 52, 56-57 (1990) (internal quotation marks omitted).

Here, the ADA expressly states that except as otherwise provided, "a State, political subdivision of a State, or political authority of at least two States may not enact or enforce a law, regulation, or other provision having the force and effect of law

---

[10]  In its appellate brief, EgyptAir argues alternatively that the district court should have concluded that the claims were preempted by the ADA and the Montreal Convention.  Bower opposed this argument in his reply brief.  We affirm the district court's dismissal of Bower's claims on the separate basis that they are indeed preempted by the ADA.

related to a price, route, or service of an air carrier that may provide air transportation . . . ."  49 U.S.C. § 41713(b)(1).  As we recently explained, ADA preemption analysis breaks down into two sub-questions:  whether the claim is based on a state "law, regulation, or other provision having the force and effect of law," (the "mechanism" question), and whether the claim is sufficiently "related to a price, route, or service of an air carrier" (the "linkage" question).  Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013).

In the case at hand, plaintiffs asserted common law claims of interference with custodial relations, negligence, negligent infliction of emotional distress, and loss of filial consortium.  Turning to our recent decision in Brown, we find that the question of whether these claims fall within the ADA's preemption provision has already been answered.  In Brown, we explained that state common law claims are covered by the language "other provision having the force and effect of law."  Id. at 65-66; see United Airlines, Inc. v. Mesa Airlines, Inc., 219 F.3d 605, 607 (7th Cir. 2000) ("State common law counts as an 'other provision having the force and effect of law' for purposes of this statute.").  But see Ginsberg v. Northwest, Inc., 695 F.3d 873, 880-81 (9th Cir. 2012), cert. granted, 133 S. Ct. 2387 (2013) (ruling common law contract claims related to an airline's frequent flyer program were not preempted by the ADA).

-15-

This is not to say that Congress intended all common law tort and contract claims to be preempted by the ADA. To the contrary, the Supreme Court has clearly stated that there are numerous claims that survive preemption. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 390 (1992) (explaining that state actions that affect airlines in too "tenuous, remote or peripheral" a manner may survive preemption). For example, the Court has drawn a distinction between state-imposed consumer protection standards and claims that an airline breached its own contract terms. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 232-33 (1995) (preempting plaintiffs' claims under the former, while allowing the latter). Numerous courts have also recognized that the Federal Aviation Authority's savings clause, 49 U.S.C. § 40120(c), as well as its mandated insurance coverage provision, 49 U.S.C. § 41112(a), would not make sense unless Congress intended certain tort claims to survive preemption. Id. at 231 n.7, 232-33; Taj Mahal Travel v. Delta Airlines, Inc., 164 F.3d 186, 194 (3d Cir. 1998); Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1265 (9th Cir. 1998).

Thus, while our decision in Brown answers the "mechanism" question, we must now turn to the "linkage" question portion of the preemption analysis and ask whether plaintiff's common law claims are sufficiently "relat[ed] to a price, route, or service of an air carrier." Brown, 720 F.3d at 64.

Boiled down to their essence, plaintiff's claims assert that EgyptAir failed to respond appropriately to numerous "red flags" when it allowed El-Nady to board a flight to Egypt with the two abducted children. Specifically, plaintiffs maintain that EgyptAir should have been alerted by the differing surnames of the mother and children; the "emergency" nature of the tickets, purchased in cash on the day of the flight; the fact that Egypt is not a signatory to the Hague Convention, enhancing the risk of international abduction; and the fact that the children's Egyptian passports did not contain U.S. entry visas. Plaintiffs argue that due to the presence of these "red flags," EgyptAir should have been alerted to the possibility of an international child abduction and either investigated further, required a signed parental consent form, or had some procedure in place to deal with these types of circumstances.

In determining whether these claims are preempted by the ADA, we first turn to the text of the statute. It is plain that the claims are neither related to a "price" or "route" in anything more than the most tangential of ways. The sticking point, then, is "service."

We have previously recognized a circuit split on the interpretation of the word "service." DiFiore, 646 F.3d at 88 n.9. Most notably, the Ninth Circuit in Charas narrowly interpreted "service" to track closely to "price" and "route." In their

opinion, "service" referred to the "frequency and scheduling of transportation, and to the selection of markets to and from which transportation is provided" as in an airline providing service "from Tucson to New York twice a day." Charas, 160 F.3d at 1265-66.

We decline to follow this approach. As we noted in DiFiore, the Supreme Court's opinion in Rowe v. N.H. Motor Transport Ass'n, 552 U.S. 364 (2008), has treated service more expansively.[11] In Rowe, the Court held that Maine's attempt to regulate tobacco shipping in the state by requiring numerous delivery verification procedures substantially impacted the "delivery services" offered by air and motor vehicle carriers. Id. at 373. In our view, Rowe forecloses the Charas interpretation of "service" as a term closely related to prices and routes. See Air Transport Ass'n of Am. v. Cuomo, 520 F.3d 218, 223 (2d Cir. 2008) (agreeing that Rowe "necessarily defined 'service' to extend beyond prices, schedules, origins and destinations"). We also believe that the Charas interpretation skirts the long-recognized canon of avoiding superfluousness. Corley v. United States, 556 U.S. 303, 314 (2009). By narrowly interpreting "service" to relate to scheduling and "service to" certain destinations, the Charas opinion does little to distinguish "service" from "route."

---

[11] The Court in Rowe was interpreting the preemption provision of the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c), which deliberately copied the exact preemption provision of the ADA. Rowe, 552 U.S. at 370. As such, the Court's interpretation of the FAAAA preemption provision guides us here.

-18-

The broader view of "service," which pre-dates Rowe in our sister circuits, includes items such as the handling of luggage, in-flight food and beverage provisions, ticketing, and boarding procedures. See, e.g., Cuomo, 520 F.3d at 223; Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir. 1996); Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336-38 (5th Cir. 1995). We implicitly adopted this approach shortly after it was initially advanced by the Fifth Circuit in Hodges. See Chukwu v. Bd. of Dirs. British Airways, 889 F. Supp. 12, 13 (D. Mass. 1995), aff'd mem. sub nom. Azubuko v. Bd. of Dirs. British Airways, 101 F.3d 106 (1st Cir. 1996) (unpublished table decision). Our most recent decisions on the "linkage" question, DiFiore and Brown, held that claims brought by luggage handlers against an airline were preempted by the ADA, noting that they could fairly relate to either a "price" or "service" of the airline. DiFiore, 646 F.3d at 88; see Brown, 720 F.3d at 71.

Although this case presents a set of facts not squarely addressed in the cases cited above, we believe these claims are similarly covered by the term "service." Plaintiff's complaint is essentially that EgyptAir allowed El-Nady to board the aircraft without adequately investigating her pre-flight documentation and status. Numerous circuits have held that where an airline denied boarding, the claims were preempted. See, e.g., Onoh v. Nw. Airlines, Inc., 613 F.3d 596, 599-600 (5th Cir. 2010); Smith v.

-19-

Comair, 134 F.3d 254, 259 (4th Cir. 1998); see also Chukwu, 889 F. Supp. at 13-14.  Whether the airline is allowing a passenger onto the plane or preventing a passenger from boarding, that determination takes place during the company's ticketing, check-in and boarding procedures.  See Chukwu, 889 F. Supp. at 14 ("The gist of [plaintiff's] complaint is that [the airline] wrongfully prevented his brother from boarding a flight, a process uniquely within the service provided and controlled by air carriers.").  We thus conclude that the ticketing, check-in and boarding procedures at issue here constitute a "service" for the purposes of the ADA in accordance with our broader view of the term "service."

Plaintiffs protest that the decision to allow boarding is nonetheless too "tenuous, remote, or peripheral," Morales, 504 U.S. at 390, in its relationship to the provision of a service.  We disagree.  The Supreme Court has noted the breadth of the "relating to" language and the broad interpretation it has afforded the phrase in cases interpreting the similarly-worded Employee Retirement Income Security Act.  Id. at 383-84; see Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 (1983).  Ultimately, Congress's intent in enacting the ADA and its preemption provision was ensuring "maximum reliance on competitive market forces" and "that the States would not undo federal deregulation with regulation of their own."  Morales, 504 U.S. at 378.  As such, state law may be preempted even if it is indirectly or generally applicable, and

-20-

preemption is favored where the law would have a "significant impact" on Congress's deregulatory goals. Rowe, 552 U.S. at 370-71.

In this case, the district court assumed that the claims in question implicated "services," but it felt that the claims did not "relate to" the "services" strongly enough. Bower v. El-Nady, 847 F. Supp. 2d 266, 272 (D. Mass. 2012). It viewed the negligence claims as being similar to personal injury tort claims, which nearly all courts agree are not preempted by the ADA. Id. at 272-73. In reaching this conclusion, the court relied heavily on Gill v. JetBlue Airways Corp., 836 F. Supp. 2d 33, 41-43 (D. Mass. 2011), which held that a personal injury lawsuit was not preempted despite its implicating the "service" of boarding because it did not sufficiently relate to Congress's deregulatory goals. The district court felt that in this case, although plaintiff's success might have an "incidental impact" on the airline's ticketing procedures, it would be a generalized one that would not put any one airline at a competitive disadvantage. Bower, 847 F. Supp. 2d at 273.

We disagree. Although the district court correctly noted that personal injury claims are generally not preempted by the ADA, there are numerous distinctions between personal injury claims and the claims present in this case. First, the fact that the ADA insurance provision mandates that airlines carry sufficient

insurance to pay "for bodily injury to, or death of" its passengers suggests that Congress never intended to preempt personal injury claims.  See 49 U.S.C. § 41112(a).  Plaintiffs do not allege bodily injury here, however.

Second, neither a tort claim like the one at issue in Gill, nor the type of minor breach of contract claim at issue in Wolens[12] gives rise to the type of patchwork state regulations that the ADA was intended to dissolve.  Much like the laws against gambling and prostitution referenced as "tenuous" in Morales, standard common law duties of care have little effect on an airlines' day-to-day operations.  See Morales, 504 U.S. at 390.  Accordingly, the ADA offers little reason to treat a passenger who slips and falls while deplaning differently than one who slips and falls in a restaurant.[13]  Were we to hold that EgyptAir violated its common law tort duty in this case, however, we would be imposing a

_____

[12]  In Wolens, the dispute centered on the terms of an airline's self-imposed frequent-flyer program.  The Court relied on the limited nature of the contract at issue in holding that the ADA's preemption clause did not extend to a breach of contract claim "seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings."  Wolens, 513 U.S. at 228.  In contrast, plaintiffs here seek to challenge a host of ticketing and boarding procedures, bringing them well beyond the limitations of the so-called "Wolens exception."

[13]  Those types of injuries would more properly fall under the purview of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (entered into force Feb. 13, 1933) [hereinafter Warsaw Convention], see McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 316-18 (1st Cir. 1995), as amended by the Montreal Convention.

fundamentally new set of obligations on airlines under the rubric of "duty of care." These would include heightened and qualitatively different procedures for the booking and boarding of certain passengers on certain flights. To defeat Congressional intent to preempt, a mere reference to a duty of care will not suffice. It is the nature and extent of that duty which alters the analysis. We believe the Third Circuit stated the issue well when it said "the proper inquiry is whether a common law tort remedy frustrates deregulation by interfering with competition through public utility-style regulation. When state law does not have a regulatory effect, it is 'too tenuous, remote or peripheral' to be preempted." Taj Mahal Travel, Inc., 164 F.3d at 194 (quoting Morales, 504 U.S. at 390).

Plaintiffs, however, suggest that the proper analysis relates to the economic impact that the laws would have on the airlines. The district court seemed to agree, stating that "it is difficult to imagine why any one airline would be put at a competitive disadvantage with others subject to the same rules." We do not see this as the correct analysis post-Rowe.[14] As we have recently recognized, the ADA preempts laws regulating the

---

[14] Even if the competitive effect on the airlines was not the wrong focus, EgyptAir arguably would feel the brunt of Bower's proposed regulations, including specialized training for ticket agents and limited kiosk check-ins for single parents traveling with children, more than the average airline by virtue of its primarily flying to a non-Hague Convention signatory country.

operations of airlines "whether at high cost or low." <u>DiFiore</u>, 646 F.3d at 88 (explaining that skycaps' attempts to change the airlines' signage and messaging, at little cost to the airline, are "just what Congress did not want the states regulating"). In our interpretation, <u>Rowe</u> shows that non-economic laws that nonetheless have a significant regulatory effect on the airlines are preempted. <u>Id.</u> at 86 ("[P]reemption might have been confined to state laws that themselves aimed at <u>economic</u> regulation as opposed to other state interests, but that course too has been foreclosed.") (emphasis in original) (citing <u>Rowe</u>, 552 U.S. at 373-76).

Plaintiffs persist, arguing that <u>Rowe</u> only talks about economic <u>motivation</u> and that economic impact is still the correct analysis. We do not agree that the Court's focus was so narrow. The Court in <u>Rowe</u> was concerned with whether the regulation imposed on the airline service obligations beyond what the market required. The Court stated that the law in question would require carriers to provide services not dictated by the market, but "even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future." <u>Rowe</u>, 552 U.S. at 372.

Significantly, <u>Rowe</u> recognized that Maine's attempts to impose verification duties on tobacco deliverers were preempted. The analogous conclusion would be that common law enforcement which would ultimately impose additional verification duties on airlines (in the business of transporting people, not tobacco) is also

-24-

preempted.  Cf. Rowe, 552 U.S. at 373 ("[t]o allow Maine to insist that the carriers provide a special checking system would allow other States to do the same.  [This] . . . could easily lead to a patchwork of state service-determining laws, rules, and regulations . . . inconsistent with Congress's major legislative effort to leave such decisions . . . to the competitive marketplace.").

Plaintiffs attempt to frame their claims as doing no more than applying general tort principles to the airlines.  In plaintiff's estimation, the duty to investigate for abductions would only be triggered when an airline is faced with specific circumstances.  Much like airlines are constrained by general tort principles in dealing with drunk and disorderly passengers, plaintiffs claim, the airlines must exhibit a basic duty of care in preventing child abductions.  We are unconvinced by this argument.  Unlike dealing with drunks, taking general care to avoid deplaning injuries, or preventing gambling/prostitution rings from being run out of their airport lounges, plaintiff's claims would impose duties on the airlines beyond what is expected of nearly every other business.  As the district court found when dismissing plaintiff's tort claims, plaintiff's set of "red flags" are not nearly as rare as they contend.[15]  See Bower, 847 F. Supp. 2d at

---

[15]  According to EgyptAir, passengers fly on an "emergency" basis, often paying with cash, every day, and a parent travels with children but no spouse present on nearly every flight.  In this case specifically, El-Nady did not take Bower's last name in accordance with Egyptian naming customs, meaning EgyptAir sees

277-78. In other words, it was not at all obvious that an abduction was taking place, as it is when an inebriated passenger causes a scene. Moreover, international child abductions tend to uniquely impact airlines, and even then only the subset of airlines flying transnational routes, as opposed to other types of businesses serving the public. This is not true with more generalized tort cases.

Furthermore, if plaintiffs prevailed, the result would be exactly what Rowe and Morales warn against: a "patchwork" of state regulations that effectively frustrate Congress's purpose in deregulating the airlines. Rowe, 552 U.S. at 373; Morales, 504 U.S. at 378-79. Were plaintiffs to succeed with their claims, the result would likely force international airlines departing from Massachusetts to institute investigative procedures, define "red flags," and develop protocols to deal with international child abductions.[16] Absent a successful case in another jurisdiction, however, they would not have these same duties in any other airports.

_____

mothers with different last names from their children regularly.

[16] This is particularly troubling given that the imposition of state law standards on the operations of international airlines is a subject highly regulated under the obligations of various treaties. The deregulation of foreign air transportation is itself enshrined in international obligations of the United States. See, e.g., 49 U.S.C. § 40101(e); International Air Transportation Competition Act of 1979, § 17, Pub. L. No. 96-192, 94 Stat. 35, 42 (1980).

Congress is aware of the issues that international child abductions raise with respect to the airlines. Should Congress choose to act in this area with federal regulation, it will be with full knowledge of the economic and non-economic impacts on the airline industry. This is highly preferable to a state-by-state (and potentially, jury-by-jury) determination of what, exactly, airlines must do when confronted with a possible abduction attempt.

In conclusion, we hold that plaintiff's claims, which challenge airline ticketing, check-in, and boarding procedures, sufficiently relate to the service of an air carrier and are therefore preempted by the ADA.[17]

### III. Conclusion

For the above-stated reasons, we affirm the district court's dismissal of plaintiff's claims.

**Affirmed**.

---

[17] Because we find that the claims are preempted, we need not address Bower's claim that the district court erred in excluding one of his expert witnesses.